## AMERICAN BONDING CO. OF BALTIMORE v. PUEBLO INV. CO.

(Circuit Court of Appeals, Eighth Circuit. November 7, 1906.)

### No. 2,367.

1. PRINCIPAL AND SURETY—SURETYSHIP AND GUARANTY—CHARACTER OF CONTRACT.

The contract of suretyship is not that the obligee will see that the principal obligor pays his debt or fulfills his contract, but that the surety will see that the principal pays or performs.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 40, Principal and Surety, § 1.]

2. SAME—CONTRACTS OF, CONSTRUED BY SAME RULES AS OTHER AGREEMENTS.

Written language has the same significance, and its meaning is to be ascertained by the same rules of law where it is found in the contract of a surety as where it appears in other agreements.

3. SAME—OBLIGATION OF SURETY NEITHER EXTENDED NOR REDUCED BY CONSTRUCTION OR IMPLICATION, BUT TO HAVE RATIONAL INTERPRETATION.

The obligation of a surety may not be extended or reduced by construction or by implication beyond the true meaning expressed by the contract.

His agreement, like other contracts, must have a rational interpretation, which, while it carefully restricts his liability to that which he agreed to undertake, does not fail to hold him to that liability which by the plain terms of his agreement he promised to assume.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 40, Principal and Surety, §§ 103, 108.]

4. SAME—FACTS—CONCLUSION.

Tenants agreed by a written lease to put into the premises a heating plant, to renew the plumbing, to make other improvements, and to pay taxes and the premiums on insurance in lieu of rent, and to give a bond conditioned for their performance of their contract and to pay for the work and material used in the improvements, to the end that no liens should be fastened upon the property by their creditors. They gave a bond with a surety conditioned that they would perform all the obligations assumed by them by virtue of the lease, but this bond contained no additional condition that they would pay for the work and material. *Held*, the lease and the bond evidenced an express agreement of the lessees and the surety that the lessees would not only furnish the heating plant and the plumbing, but that they would pay for the work and material employed therein, to the end that no lien of any creditor of theirs should be fastened upon the property, and the surety was liable to the lessor for the amount the latter necessarily paid to relieve its property from a lien for this labor and material.

5. SAME—ALTERATION OF GUARANTIED CONTRACT WITHOUT HIS CONSENT DISCHARGES SURETY.

Any material alteration of the contract guarantied, without the consent of the surety, discharges him.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 40, Principal and Surety, §§ 169, 170.

Discharge of surety on alteration of contract, see note to Zeigler v. Hallahan, 6 C. C. A. 6.]

150 F.—2

6. SAME—WRONGFUL SURRENDER OF SECURITY DISCHARGES SURETY PRO TANTO.

The wrongful surrender by the obligee of security for the performance of the obligation guarantied, without the knowledge of the surety, discharges him from liability entirely or pro tanto, according to the value of the security surrendered.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 40, Principal and Surety, §§ 244-268.]

7. LANDLORD AND TENANT—LEASE—SURRENDER TERMINATES AND DESTROYS RIGHTS CONDITIONED ON CONTINUANCE.

The surrender of leased premises by the lessee and their acceptance by the lessor during the term closes the term and the lease, and destroys all rights conditioned on its continuance thereunder.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 32, Landlord and Tenant, § 368.]

8. SAME—SURRENDER RELEASES FROM RENT NOT DUE, ACCRUING AND TO ACCRUE, BUT NOT THAT ACCRUED AND DUE.

Such a surrender releases the lessee from liability for rents accruing, but not yet due, from rents to accrue, and from immature obligations, but leaves him liable for all rent accrued and due and for all obligations whose performance is due.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 32, Landlord and Tenant, §§ 788, 789.]

9. PRINCIPAL AND SURETY—DEFAULT OF PRINCIPAL.

There was a lease for a term of 30 months, which expired on September 12, 1905, in which the lessor granted to the lessees the option to purchase the leased premises during the lifetime of the lease, and the lessees agreed that upon their default the lessor might terminate the lease and take possession as of its former estate. They gave a bond with a surety for the performance of all their obligations under the lease, made default, and the surety was notified thereof in August, 1904. The defaults continued, and on December 27, 1904, the lessees, without notice to the surety, surrendered the leased premises and the lessor accepted them. *Held* this surrender terminated the lease, but it did not relieve the surety from liability for the matured obligations of the lessee, because it did not constitute an alteration, but an enforcement of the terms of the lease.

The option to purchase ceased with the lease, but the surrender did not wrongfully deprive the surety of its right to subsequently exercise this option, because that right was conditioned by the performance by the lessees of their obligations guarantied by the surety, and the lessees and the surety were both in default.

10. LANDLORD AND TENANT—SURRENDER—EFFECT ON LIABILITY FOR RENT ACCRUED AND RENT ACCRUING.

The lien for the work and material used in the heating plant and plumbing was fastened upon the property more than a year before the surrender, but the suit to foreclose it was pending, and did not ripen into a decree which determined its amount until a few days thereafter.

*Held*, the obligation to pay for this labor and material, as for rent accrued, matured before the surrender, which did not release the lessees nor the surety from liability therefor.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 32, Landlord and Tenant, §§ 788, 789.]

11. SAME.

The lessees agreed to pay the taxes of 1904 when they became due and payable. One half of them became due and payable on the last day of February, 1905, and the other half on the last day of July, 1905. The surrender was on December 27, 1904.

*Held* the obligation to pay these taxes, as for rent accruing, but not completely accrued nor due, had not matured at the time of the surrender, and by that act the lessees and the surety were released from liability therefor.

12. SAME—SURRENDER BETWEEN RENT DAYS RELEASES FOR CURRENT PERIOD.

A surrender between rent days releases the lessees and their sureties from liability for the rent for the current period between them.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 32, Landlord and Tenant, §§ 788, 789.]

(Syllabus by the Court.)

In Error to the Circuit Court of the United States for the District of Colorado.

The American Bonding Company of Baltimore, a corporation, was a surety upon a bond of R. C. Miller and H. G. Bahne, lessees, which was conditioned that they would perform the obligations by them assumed under the lease. They made default and a judgment was rendered against the surety, upon a directed verdict in the court below, for the sum of $10,000, the penalty of the bond. This writ of error was sued out to reverse that judgment.

The lease was dated March 9, 1903. The Pueblo Investment Company, a corporation, was the lessor, and Miller and Bahne were the lessees. The term of the lease was 30 months, from March 12, 1903, to September 12, 1905. The property was a hotel building and the grounds upon which it stood. The lessor demised the premises to the lessees for the term of the lease, and also granted to them an option to purchase the property for $120,000 at any time within the lifetime of the lease. In lieu of a cash rent for the property, the lessees agreed to make certain improvements and repairs, to, pay certain premiums for insurance and certain taxes upon the premises. They covenanted that they would, as rent for the premises, at once upon taking possession of the property, "put steam heat in the said hotel including seventy-one (71) guest rooms, the said steam-heating plant to be in all respects first class, competent and sufficient properly to heat said rooms, replace the present bath tubs and closets throughout the hotel except in the mineral baths with the latest modern tubs and closets, renew the plumbing in said hotel in first class shape," recarpet the halls and such of the rooms as might reasonably need it, pay the premiums upon $70,000 of insurance upon the hotel property during the term of the lease so as to keep it insured for that amount, pay the taxes assessed against the property for the years 1903, 1904, and the first half of the taxes for the year 1905, and that they would perform various other acts not material to this action which are specified in the lease. One of the terms of the lease was that if default should be made in any of the covenants or agreements to be kept by the lessees, except as to such matters as might be under arbitration at the time of such default, it should "be lawful for the party of the first part, its successor, agent, or assigns or attorney, at its election, to declare said terms of lease ended and to enter upon said premises or any part thereof, either with or without process of law, to re-enter and to expel, remove and put out, using such force as may be necessary, the said parties of the second part, or any other person or persons occupying or upon said premises, and re-gain, re-possess and enjoy said premises as in its first and former estate, and shall not in such action be liable to, or indebted for any cause of action or damages upon the part of the parties of the second part, their executors, administrators or assigns." Another paragraph of the lease read in this way: "In case the said parties of the second part fail to purchase or sell the said property at a cash price of one hundred and twenty thousand dollars within the lifetime of this lease, they will, at its expiration, turn back the said property to the party of the first part or its assigns, with all additions thereto made by them in the way of furniture, fixtures, equipment; and, upon the signing of these presents, they will give a good and satisfactory bond to the party of the first part in the penal sum of ten thousand dollars ($10,000) conditioned upon the faithful performance of this contract on their part and of all the provisions therein contained by them to be done and performed; and that they will justly pay for all material and labor used or employed in the betterment or repair of said property

and to the end that no liens of any character shall be placed against the said property by any creditor of the parties of the second part."

On March 12, 1903, the lessees, as principals, and the bonding company, as surety, gave a bond to the investment company in the sum of $10,000, which recited that the investment company had executed the lease with the option to the lessees of purchasing at a certain cash price, and that "in and by said lease the said lessees in lieu of a fixed rental for the said property are to do and perform certain things in the way of putting the said hotel in first class repair, adding steam-heating and electric light plant thereto, and make certain payment of taxes and insurance, to which said lease reference is hereby made for the purpose of ascertaining in detail the exact obligations assumed by the said lessees thereunder," and covenanted that, if the lessees should "well and truly perform the obligations by them assumed under the said lease to the true intent and meaning thereof, then this obligation to be void and of no effect, otherwise to remain in full force and virtue."

The lessors entered into possession of the property at the commencement of the term, and remained in possession until December 27, 1904. Prior to that date they had made default in the payment of the taxes assessed for the year 1903 upon the property and the furniture, in the payment of insurance premiums provided in the lease to the amount of $416, in the recarpeting of the hotel, halls, etc., to the damage of the plaintiff in the sum of $446.40, and, although they had installed a heating plant and renewed the plumbing, they had failed to pay therefor, so that a lien for a large amount on account thereof had been fastened upon the property by the contractor, and he had brought a suit against the investment company to enforce this lien. The investment company had notified the bonding company that the lessees had failed to pay the taxes for the second half of the year 1903, due on August 1, 1904, that they had failed to pay the insurance premium on policies of fire insurance which the lease required them to satisfy, and that this suit to enforce this lien had been commenced. But the bonding company paid no taxes or premiums for insurance, and did nothing to discharge the lien or to defend against it. On December 26, 1904, the lessees notified the lessor that they could not continue to operate the hotel, and that they wished to turn the property over to it on the next day. On December 27, 1904, they refused to continue to operate the hotel under the lease, surrendered the property to the lessor, and it accepted it. The investment company sued the bonding company on the bond for the damages it sustained by reason of the failure of the lessees to keep their covenants and recovered the judgment assailed.

John M. Waldron (R. D. Thompson and Peete & Abrahams, on the brief), for plaintiff in error.

Robert S. Gast and Chas. E. Gast, for defendant in error.

Before SANBORN and VAN DEVANTER, Circuit Judges, and PHILIPS, District Judge.

SANBORN, Circuit Judge, after stating the case as above, delivered the opinion of the court.

A surety who guaranties by his bond the performance by his principal of the latter's contract with the obligee is bound for the fulfillment of no new or modified agreement, and any material alteration of the bonded contract without his consent releases him from liability for its fulfillment. The wrongful surrender by the obligee in the bond of security for the performances of the guarantied obligation, without the knowledge of the surety, discharges him from liabilty therefor entirely or pro tanto, according to the value of the security thus surrendered. Brown v. First National Bank, 66 C. C. A. 293, 298, 132 Fed. 450, 455; Brown v. First National Bank, 112 Fed. 901, 904, 50 C. C. A.

602, 605, 56 L. R. A. 876; Bank v. Colcord, 15 N. H. 119, 41 Am. Dec. 685; Rogers v. School Trustees, 46 Ill. 428; Colebrooke on Collateral Securities (2d Ed.) § 239; Hays v. Ward, 4 Johns. Ch. (N. Y.) 123, 130.

By the terms of the lease, whose performance by the lessees was warranted by the bond in suit, the obligee in the latter granted to the tenants, the principals in the bond, the option to purchase the leased premises for $120,000 at any time during the lifetime of the lease. The surety in the bond had the right to acquire and to exercise this option by discharging the obligations of the lessees to the investment company, the lessor, and by invoking the principle of subrogation. The surrender of leased premises by the tenants during the term of the lease and the acceptance of the property by the landlord, without a notice that the latter takes it and will hold and use it during the remainder of the term for the use and benefit of the tenants exclusively, closes the term of the lease, and destroys all rights conditioned upon its subsequent continuance. Prout v. Roby, 15 Wall. 471, 476, 21 L. Ed. 58; Watson v. Merrill, 136 Fed. 359, 362, 69 C. C. A. 185, 188, 69 L. R. A. 719. The term specified in the lease was to expire on September 12, 1905, and the lessees and their surety, if they fulfilled their covenants, had the right to purchase the property for $120,000 on or before that date. The surrender of the hotel by the tenants and its acceptance by the landlord on December 27, 1904, closed the term of the lease on that day, and deprived the lessees and the surety of the right to make that purchase thereafter.

The first and the chief complaint of counsel for the surety is that the court below refused to hold that this surrender, which was made and accepted without notice to the surety, discharged it from all liability under its bond. They argue with commanding ability and great force, and ingenuity that this surrender modified the terms of the lease and deprived the surety of the security of the right to purchase between December 27, 1904, and September 13, 1905, and that either effect was sufficient to release it. In support of this position they cite authorities which sustain the general rules of law which have already been stated, and Stern v. Sawyer (Vt.) 61 Atl. 36, where, without notice to the surety of the tenant, the landlord accepted a release of part of the leased premises which he sold for $2,250 and the lessee waived the performance of the lessor's covenant to repair, Holme v. Brunskill, Law Rep. 3 Q. B. D. 495, in which, without notice to the surety, the principal released a part of the demised premises to the lessor in consideration of a reduction of the rent ten pounds annually, Brandt on Suretyship & Guaranty, § 429, where a case is cited in which a yard, shed, and frame dwelling house were rented for $375 per month, and, without notice to the surety for the lessee, the latter surrendered the dwelling house to the landlord in consideration of a reduction of the rent for the remainder of the premises to $300 per month (Penn v. Collins, 5 Rob. [La.] 213), and Warren v. Lyons, 152 Mass. 310, 25 N. E. 721, 9 L. R. A. 353, in which there was a lease for a specified term for a rental of $108.30 per month, and a covenant by the lessee to pay the same rent as long as he held the premises after the expiration of the term, and before the term lapsed the

lessor and the lessee, without notice to the surety of the latter, made a contract that after the expiration of the term the lessee should pay $100 per month while he occupied the property. In the case last cited the court held that the surety was not liable for the defaults of the lessee subsequent to the expiration of the term, because thereafter he was in possession under a new lease, and in the other cases the courts held that the sureties were discharged from liability. The case of Warren v. Lyons is not in point because there is no attempt to charge the defendants here with liability for any default under any new lease or under any contract different from that specified in their bond. All the breaches of covenant for which it is liable here occurred before the surrender of the premises. The other authorities cited fail to control this case because it falls without the rule of law which governs them. That rule is not that an enforcement, but that an alteration of the terms of a guarantied contract, without notice to the surety, discharges him. The case at bar is one of enforcement of the contract assured. Those cited are cases of material alteration of the terms of the guarantied agreements. In the three cases of partial release the lessees were not in default, and the lessors had no right to the releases. The lessees surrendered property which they had the undisputed right to hold during the term in violation of the terms of the original contracts. They modified the terms of the leases by agreements with their lessors, and thereby made new leases without notice to the sureties. The sureties were discharged because the lessors and the principals made new contracts, not in the performance of the terms of the original agreements, but in conflict with them. It was not so in the case at bar. The lease guarantied by the surety here provided that, if the lessees made default in the performance of any of their covenants or agreements, the lessor might lawfully declare the term of the lease ended and repossess and enter the premises as in its first and former estate. On December 27, 1904, when the surrender was made, the lessees were in default in the fulfillment of their covenant to pay taxes, of their covenant to pay premiums on insurance, of their covenant to recarpet, and of their covenant to pay for the heating plant and the plumbing, so that the lessor had the undoubted right under the provisions of the lease to declare its term ended and to take possession of the property for itself. The fact that it exercised this right with the consent and at the request of the lessees, instead of forcibly and against their protest, cannot change its character or its effect. The surrender of the premises by the lessees and the acceptance of the property by the lessor, after the defaults of the former, were acts in exact accordance with, and in the performance of the terms of the guarantied lease. They worked no alteration or modification of that contract, and for that reason they did not release the surety.

And here is the answer, also, to the contention that this surrender deprived the sureties of the option to purchase after December 27, 1904. The right to exercise this option was by the express provisions of the contract limited by the condition that the lessees should fulfill their covenants. It was granted during the lifetime of the lease only. The lifetime of the lease was conditioned, as we have seen, by the right of the lessor to end it whenever the lessees were in default in the per-

formance of any of their covenants. When the surrender occurred they had made defaults, the surety had been notified thereof more than four months before the surrender, and neither the lessees nor the surety had removed them. The only right of the surety to exercise the option was by subrogation to the rights of the lessees, and it could rise no higher than theirs. The lease expressly provided that after the default of the lessees the lessor might terminate it, and might thereby end the right of the lessees and of the surety to purchase. By the acceptance of the surrender it effected this termination. But this act deprived neither the lessee nor the surety of the security of any right to purchase, because that right was expressly limited by the condition that it should end whenever the lease terminated by reason of the default of the lessees and the retaking of the premises by the plaintiff.

There is another reason why this surrender failed to discharge the surety. Its principals had failed to perform covenants of the lease whose fulfillment it had warranted. It had received notice of this fact four months before the surrender, and it had not discharged the broken obligations of the principals. The investment company had fulfilled all the terms of the contract which it had undertaken to perform. The principals in the bond and the surety had broken their covenants and the obligee had not, and the surety was aware of these facts. Now, although a surety is a favorite of the law and his liability may not be enlarged by construction nor extended without his consent by modifications of the guarantied contract, yet he, and not the obligee, covenants to pay and must respond for the damages caused by the defaults of his principals for which he promises indemnity. The contract of suretyship is not that the obligee will see that the principal pays his debt or fulfills his contract, but that the surety will see that the principal pays or performs. Nelson v. First National Bank, 16 C. C. A. 425, 435, 69 Fed. 798, 807; Williams v. Lyman, 31 C. C. A. 511, 514, 88 Fed. 237, 241. The obligee does not represent to the surety that the principal will keep his covenants, but the surety holds his principal out to the obligee, and represents and promises to him that the principal will perform his agreements. The surrender was the natural and lawful effect of the failure of the principals in this bond to keep the covenants which the surety warranted that they would fulfill and of the failure of the surety after notice to perform them for the principals. Even where one of two innocent parties must suffer from the wrongful act or default of a third, that one must bear the loss who intentionally or negligently enables the third party to cause it. The surety in the case in hand by the execution of its bond to the plaintiff gave a credit to the principals thereto and enabled them to hold the possession of this hotel for nearly two years and to incur the liabilities upon which this action is based, and to the amount of its bond it ought to bear the burden of the loss its action has occasioned, even if it had been innocent of default or wrong. A fortiori is it liable when it was itself in default for more than four months before the surrender occurred. "Where one of two innocent parties must lose, and one of them is in fault, the law throws the burden of the loss upon him." Magee v. Manhattan Life Ins. Co., 92 U. S. 93, 98, 23 L. Ed. 699; Hearne v. Nichols, 1 Salk. 289. The result is that the surrender

of the premises and the termination of the lease on December 27, 1904, when both the principals and the surety were in default in the performance of their covenants, did not discharge the surety from the obligation of the bond.

The lessees made agreements with a contractor, a corporation, for the heating plant and the plumbing specified in the lease. The contractor completed the improvements by September 22, 1903, but the lessees did not pay it for them, and on January 3, 1905, it recovered a judgment against them for $8,795.93, and a decree against them and the lessor to the effect that it held a lien upon the leased premises for $5,175 and interest from the date of the decree. The lessor paid the latter amount to the contractor on January 20, 1905, in order to discharge its property from the lien, and the court below held that it was entitled to recover this amount from the surety on the bond. Counsel for the defendant contend that this was an erroneous ruling, and insist that the surety is not liable for this amount (1) because there was no express agreement in the lease that the lessees would pay for the heating plant and the plumbing which they agreed to furnish as part of their rent; (2) because the lease contained their express promise to give a bond with a surety conditioned to pay for the material and labor used in these improvements, and this stipulation excludes any implication of any other contract to pay for them (Hawkins v. U. S., 96 U. S. 689, 698, 24 L. Ed. 607); and (3) because the contract of the surety must be strictly construed, and may not be enlarged by construction or implication (U. S. v. National Surety Co., 92 Fed. 549, 550, 34 C. C. A. 526, 527).

The legal effect of the contract between the plaintiff, on the one hand, and the lessees and their surety, on the other, that the latter will pay for the labor done and the material furnished in making the improvements, is the same as the legal effect of a contract between them that the latter will indemnify the former against liens for such labor and material, or that they will pay for them, to the end that no liens shall be placed upon the property. The only damages which the plaintiff could recover under the first contract are those which it might sustain by the fastening of liens upon its property, and no one who performed work or furnished material could recover of the surety under either because he would be a stranger to each and would have no interest therein. As the distinction between contracts with owners of property to pay for work done and materials furnished to improve it and contracts to protect them against liens upon it is not material in the case in hand, it will not be further noticed in the discussion which is to follow.

A surety is never liable beyond the strict terms of his contract. His obligation may not be extended by construction or by implication. On the other hand, it may not be reduced or destroyed thereby. His agreement, like other contracts, must have a rational construction, an interpretation which, while it carefully restricts his liability to that which he agreed to undertake, does not fail to hold him to that liability which, by the plain terms of his agreement, he promised to assume. Written language has the same significance, and its meaning must be ascertained by the same rules of law when it is found in the contract

of a surety as when it appears in other agreements. National Surety Co. v. U. S., 63 C. C. A. 512, 514, 129 Fed. 70, 72; U. S. Fidelity & Guaranty Co. v. Board of Commissioners of Woodson County, 145 Fed. (C. C. A.) 144, 148; Stearns on Law of Suretyship, p. 18; Belloni v. Freeborn, 63 N. Y. 388; Wills v. Ross, 77 Ind. 1, 40 Am. Rep. 279.

This bond recites the fact that the lease has been made, and that the lessees "in lieu of a fixed rental for the said property are to do and perform certain things in the way of putting the said hotel in first class repair, adding steam heating and electric light plant thereto, and make certain payment of taxes and insurance, to which said lease reference is hereby made for the purpose of ascertaining in detail the exact obligations assumed by the said lessees thereunder"; and it is conditioned that the lessees shall "well and truly perform the obligations by them assumed under the said lease to the true intent and meaning thereof." The legal effect of these terms of the bond is to embody the entire lease therein to the same extent as if it had been literally written into it and to bind the surety not by implication, but, by the express terms of the bond, to indemnify the lessor against all loss it sustains by the failure of the lessees to perform any of the obligations which they assumed under the true intent and meaning of the lease. This conclusion is not inconsistent with the excerpt cited by counsel from Stearns on Law of Suretyship (section 143), that, "if the main contract is broader in its scope than the limits fixed in the bond, a reference to the contract will only incorporate so much of the same as is within the limits of the terms of the bond," because the main contract is not broader in its scope than the limits fixed by this bond which by its plain terms guaranties the performance of every obligation assumed by the lessees by means of the lease. The question then becomes: Was it the true intent and meaning of the lease that the lessees should pay to their lessor their rent for the hotel by putting new plumbing and a new heating plant therein at their own expense or at the expense of the lessor? Was it that they should pay the rent they agreed to give to their lessor or that the latter should pay this rent to itself? The question seems to admit of but one answer. But counsel for the surety present ingenious arguments and persuasive authorities in support of their contention that the effect of the contract was that the lessor must pay for these improvements. Electric Appliance Co. v. U. S. Fidelity & G. Co. (Wis.) 85 N. W. 648, 53 L. R. A. 609; Dunlap v. Eden (Ind. App.) 44 N. E. 560; City v. Wolf (Ill.) 45 N. E. 218; Boas v. Maloney (Cal.) 70 Pac. 1004; Gato v. Warrington (Fla.) 19 South. 883. The crucial question in the first three cases was whether or not a laborer or materialman could recover upon a bond given to the owner of the property conditioned for the faithful performance by the contractor of his agreement to furnish the necessary labor and material for the improvement, and it was answered in the negative, as it would be if such a plaintiff bought an action of this character upon the bond in suit upon the ground that the bond was not given for the benefit of the laborer or materialman, and that he had no interest in it. This question is not presented in the case at bar, and these authorities do not rule this case. In the last two cases the Supreme Courts of

California and Florida decided that the owner of property who had made a contract with a builder to furnish the necessary work and material to erect and to complete a structure according to plans and specifications could not recover of a surety upon a bond for the performance of the obligations of the contractor the amounts which he was compelled to pay to discharge liens upon his property for the work and material which the contractor had agreed to furnish, upon the ground that, while the contractor agreed to furnish, he did not agree to pay for this work and material, notwithstanding the fact that the owner contracted to pay, and did pay to the builder a price commensurate with the value of the finished structure and of all the work and material therein. The effect of these decisions is that an agreement to furnish work and material to the owner of property for a price paid which is commensurate with the full value thereof is performed when the contractor furnishes the work and material at the expense of the owner, so that the latter is compelled to pay for them twice while the former gets the price for little or nothing. This view failed to commend itself to the Supreme Courts of Indiana and Kentucky, and they held that an agreement to furnish was an agreement to pay for such work and material, and that the owner of the property was entitled to recover of the surety the moneys paid to discharge liens there for under a similar contract and bond. Mackenzie v. Board of School Trustees, 72 Ind. 189, 196; Mayes v. Lane (Ky.) 76 S. W. 399, 400. Which is the true construction?

Counsel call attention to the stipulations in the lease to the effect that the lessees would give a bond with a satisfactory surety for the performance of their obligations, and that they should pay for the work and material employed in the improvements they agreed to furnish, and to the fact that the bond in suit is conditioned for the performance of all the obligations of the lessees only, and does not contain the additional condition that they shall pay for the work and material. They invoke the rules that an express agreement relative to a subject-matter excludes any implied contract concerning it, and that every contract is presumed to contain the entire agreement of the parties, and from these premises they argue that no agreement by the lessees to pay for the work and labor other than the bond may be deduced from the lease, and that, inasmuch as the condition that the lessees shall pay for the work and labor is not found in the bond, the surety is not bound to indemnify against the failure of the lessees to make such payments. But the stipulation for the bond is a mere contract for additional security for the performance of obligations assumed by the lessees by the other terms of the contract. One who makes a written contract to pay money or to perform any act does not revoke his agreement or renounce his obligations thereunder by inserting in the contract a further agreement to give security for its performance. Moreover, the omission from the bond of the condition that the lessees should pay for the work and material is of no importance, because by the express terms inserted in the bond the surety guarantied the performance of every obligation which the lessees assumed under the lease. If one of their obligations thereunder was to pay for the work

and material, the surety agreed to indemnify the lessor for a failure of the lessees to perform this obligation. If this was not one of their obligations, the surety is not liable for their failure to perform. If no bond whatever had been given, and if the surety had merely indorsed upon the lease for a valuable consideration its guaranty of the performance by the lessees of their obligations thereunder, it would certainly have been liable for a default in the performance of any one of them, and this is the exact liability which it agreed to assume by the plain terms of its bond. The decisive question then recurs—did the lessees agree by the express terms of their lease to pay for the labor and material employed in the construction of the heating plant and in the renewing of the plumbing which they undertook to furnish as a part of their rent? The soundness of the rules of construction and of law which counsel for the surety cite is not denied. But the only purpose of rules of interpretation is to ascertain the intention which the parties to an agreement expressed by their writing, and, when that intention shines forth from the words of the agreement or is lawfully ascertained therefrom, rules of construction are unavailing to defeat its proper enforcement. The purpose of every agreement is to record the intention of the parties. The object of all construction is to ascertain that intention from the writing and to enforce it. Rules of construction more fundamental, more general in their application, and not less authoritative than those cited by counsel for the defendant are:

The court should so far as possible put itself in the place of the parties when their minds met upon the terms of the agreement, and then from a consideration of the writing itself, of its purpose and of the circumstances which conditioned its making, endeavor to ascertain what they intended to agree to do, upon what sense and meaning of the terms they used their minds actually met. Accumulator Co. v. Dubuque St. Ry. Co., 12 C. C. A. 37, 41, 42, 64 Fed. 70, 74; Salt Lake City v. Smith, 104 Fed. 457, 462, 43 C. C. A. 637, 643; Fitzgerald v. First National Bank, 52 C. C. A. 276, 284, 114 Fed. 474, 482.

That intention must be deduced, not from specific provisions or fragmentary parts of the instrument, but from the entire agreement, because the intent is not evidenced by any part or stipulation of it, nor by the instrument without any part or provision, but by every part and term so construed, if possible, as to be consistent with every other part and with the entire agreement. Jacobs v. Spalding, 71 Wis. 177, 188, 36 N. W. 608; Boardman v. Reed, 6 Pet. 328, 8 L. Ed. 415; Canal Co. v. Hill, 15 Wall. 94, 21 L. Ed. 64; O'Brien v. Miller, 168 U. S. 287, 297, 18 Sup. Ct. 140, 42 L. Ed. 469; Pressed Steel Car Co. v. Eastern Ry. Co., 57 C. C. A. 635, 637, 121 Fed. 609, 611; Uinta Tunnel, etc., Co. v. Ajax Gold Min. Co., 141 Fed. 563, 73 C. C. A. 35; U. S. Fidelity & G. Co. v. Board of Com'rs (C. C. A.) 145 Fed. 144, 148.

Where the language of an agreement is contradictory, obscure, or ambiguous, or where its meaning is doubtful, so that the contract is fairly susceptible of two constructions, one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would

not be likely to enter into, the interpretation which makes it a rational and probable agreement must be preferred to that which makes it an unusual, unfair, or improbable contract. Pressed Steel Car Co. v. Eastern Ry. Co., 57 C. C. A. 635, 637, 121 Fed. 609, 611; Coghlan v. Stetson (C. C.) 19 Fed. 727, 729; Jacobs v. Spalding, 71 Wis. 177, 186, 36 N. W. 608; Russell v. Allerton, 108 N. Y. 288, 292, 15 N. E. 391.

The intention of the parties when manifest, or when ascertained from the written agreement in accordance with the basic rules of interpretation, must control and be enforced without regard to inapt expressions and technical rules of interpretation, unless that intention is directly contrary to the plain sense of the binding words of the agreement. Prentice v. Duluth, etc., Forwarding Co., 7 C. C. A. 293, 298, 58 Fed. 437, 443; Westervelt v. Mohrenstecher, 22 C. C. A. 93, 95, 76 Fed. 118, 121; Tillitt v. Mann, 104 Fed. 421, 424, 43 C. C. A. 617, 619; Salt Lake City v. Smith, 43 C. C. A. 637, 643, 644, 104 Fed. 457, 462; Uinta Tunnel, etc., Co. v. Ajax Gold Min. Co., 141 Fed. 563, 567, 73 C. C. A. 35; U. S. Fidelity & G. Co. v. Board of Com'rs (C. C. A.) 145 Fed. 144, 148; Witt v. Railway Co., 38 Minn. 122, 127, 35 N. W. 862; Driscoll v. Green, 59 N. H. 101; Johnson v. Simpson, 36 N. H. 91; Walsh v. Hill, 38 Cal. 481, 486, 487.

When this lease was made, the lessees were seeking the use and occupation of the hotel owned by the investment company, and the latter was trying to obtain compensation for that use. The purpose of the lease was to record the extent to which each of these parties attained the object it sought. The investment company clearly agreed to grant the use and occupation, and the lessees plainly covenanted to put a heating plant and plumbing in the hotel in part payment for their use of these premises. These parties necessarily intended to provide by these stipulations that either the investment company or the lessees should pay for the labor and material necessary to make these improvements. The inference that they intended or agreed to defraud laborers or materialmen out of the value of their work or property is inadmissible. It is a settled rule of law that a lessee may not make repairs at the expense of the lessor unless there is a special agreement between them that he may do so (Sheets v. Selden, 7 Wall. 416, 423, 19 L. Ed. 166; Mumford v. Brown, 6 Cow. [N. Y.] 475, 16 Am. Dec. 440), and there was no such agreement here.

An agreement that the lessees should pay for the improvements which they agreed to give as rent for the premises is fair, rational, and such an agreement as prudent men would naturally make, while a contract that the lessor should pay for them is unreasonable, unfair, absurd, one that reasonable men would not be likely to enter into.

The maxim, "Noscitur a sociis," points in the same direction. The promise to put the steam heating plant and the new plumbing in the hotel is found in the covenants of the lessees among those things for which they promised to pay in lieu of a fixed rental, to wit, the taxes, the premiums on insurance, repainting, repapering, changing skylight, relaying tiling, recarpeting, furnishing an electric dynamo and an electric light plant, rewiring, constructing a stone curbing, repairing the

annex, renewing the sidewalk, grating the area ways, and making, as the lease reads, "what other improvements are needed in and about the hotel so that it may be first class in every respect—all work and material to be of its kind first class, and to keep the said hotel, annex, mineral well, the furniture and equipment in good repair at their own expense, paying the water rates and all license fees incident to the running of said property." As the evident meaning of these covenants was that the lessees should pay the taxes, the premiums, and for the other improvements and repairs they agreed to make, these covenants must have signified that the lessees should also pay for the plumbing and the heating plant which are associated with the other improvements in them.

The stipulation in the lease for the bond to secure performance on the part of the lessees confirms this view. The argument of counsel that that portion of this stipulation which promises a bond conditioned that the lessees shall pay for the work and material demonstrates the fact that they did not otherwise undertake to pay therefor proves too much. The stipulation requires a bond to secure the performance of all the obligations of the lessees under the lease, and also their payment for the work and material. If the stipulation for a bond for the payment for the work and material proves that they had assumed no obligation by the lease to pay for them, then by the same mark the stipulation for the bond for the performance of all their obligations under the lease proves that they had never incurred any obligations thereunder. This provision of the bond is for security for the performance of the obligations assumed by the lessees by virtue of the other provisions of the lease, and it carries in itself persuasive evidence that by those other provisions the lessees had agreed to pay for this work and material because it promised the bond to secure this payment, "to the end that no liens shall be placed against the property by any creditor of the lessees." If the lessor was to pay for this labor and material and the lessees were not, there would be no creditor of the lessees on account of them.

The situation and surrounding circumstances of the parties to this lease at the time of its execution, the purpose of the writing and of the parties who signed it, the entire body of the agreement and all its stipulations considered together, the fact that the promise to furnish the heating plant and the plumbing is found in the covenants of the lessees to do other things for which they were unquestionably to pay, the object of this promise, to wit, to compensate the lessor for the use of the premises in lieu of rent, the fact that this object may not be attained by an interpretation that the lessor itself was to pay for these improvements, that such an interpretation makes the contract irrational, improbable, unfair, absurd, while the construction that it expressed the promise of the lessees to pay for the improvements they agreed to furnish renders the agreement reasonable, equitable, probable, and such as prudent men would naturally make, and the fact that this meaning is consistent with every term of the lease—these considerations converge with compelling force to convince that the parties to this lease intended to agree, and did contract thereby, that the lessees

should pay for the heating plant and plumbing which they covenanted to furnish as a part of their rent, and that the lease, properly interpreted, clearly expresses that agreement. The conclusion is that the true intent and meaning of the express terms of the lease is that the lessees agreed to pay for the heating plant and the plumbing which they covenanted to furnish to the lessor in lieu of rent. And, as the surety by its bond guarantied the performance of all the obligations which its principals assumed by the lease, it guarantied the performance of this obligation, and it was liable for the payment necessary to discharge the lien which occasioned this controversy.

Since the result is that a proper construction of the lease and bond discloses an express agreement therein by the lessees and the surety to pay for the heating plant and the plumbing to the extent necessary to discharge the property of the lessor of liens therefor, the arguments of counsel against the implication of such a stipulation become immaterial, and it is unnecessary to consider them farther. The question in this case is not a question of implication, but of construction, and the lessees and the surety were liable to pay for the discharge of the lien in controversy by the express terms of their contracts, legally interpreted.

The allowance of $107.60 which the lessor paid to relieve the carpeting in the hotel, which the lessees had laid in pursuance of their covenant in the lease, from a mortgage for its purchase price, was right, for the same reasons that sustain the allowance of the item of $5,175 and interest, which has been considered.

The lease was terminated by the surrender on December 27, 1904.

The lien for the $5,175 had been fastened upon the property as early as December 1, 1903, but the contractor had claimed in his recorded statement several thousand dollars in excess of this sum which the court on January 1, 1905, decreed to him, and his suit to foreclose the lien was pending when the surrender occurred.

The taxes for the year 1904, $2,279.34, were levied in that year and thereupon became a lien upon the property, but they were "due and payable, one-half on or before the last day of February, and the remainder on or before the last day of July of the year" 1905. 3 Mills' Ann. St. Rev. Supp. § 3802. The covenant of the lease was to pay these taxes "at the times the same shall become due and payable." Counsel for the surety objects to the allowance of either of these items on the ground that the claims for them had not matured and become actionable when the lease was terminated.

The termination of a lease during its term by surrender, by re-entry, or by eviction, without more, discharges the lessee from liability for rents that have not accrued, but leaves him liable for all the rents which have accrued and become due, and for the performance of all covenants whose fulfillment is due. The liability of the lessees and of the surety for the $5,175 accrued, and the performance of the covenant to pay it and to discharge the lien, was due when that lien was fastened upon the property more than a year before the surrender occurred, and therefore they were not relieved from this liability by the subsequent termination of the lease. The liability of a tenant for rent

accrued and due is not discharged by surrender, re-entry, or eviction. McKensie v. Farrell, 17 N. Y. Super. Ct. 192, 204; Vernam v. Smith, 15 N. Y. 327; Learne v. Ryder, 61 Barb. (N. Y.) 552, 556; Welcome v. Hess, 90 Cal. 507, 27 Pac. 369, 25 Am. St. Rep. 145; McGregor v. Board of Education, 107 N. Y. 511, 517, 14 N. E. 420; Sperry v. Miller, 16 N. Y. 407; 2 Wood's Landlord & Tenant (2d Ed.) § 477, note 3, p. 1096.

But a surrender, re-entry, or eviction between rent days, or at any time before the rent has fully accrued, releases the lessee from liability therefor, and defeats an action for its recovery. Smith v. Shepard, 15 Pick. (Mass.) 147, 25 Am. Dec. 432; Curtiss v. Miller, 17 Barb. (N. Y.) 477, 479; Home Life Ins. Co. v. Sherman, 46 N. Y. 370; Giles v. Comstock, 4 N. Y. 270, 275, 53 Am. Dec. 374; Reed v. Snowhill, 51 N. J. Law, 162, 16 Atl. 679; Hall v. Gould, 13 N. Y. 127.

In Smith v. Shepard, 15 Pick. (Mass.) 147, 150, 25 Am. Dec. 432, the rent was payable quarterly in advance, and eviction was made on the first day of the quarter. Chief Justice Shaw said:

"As to the quarter's rent due by covenant in advance, the defendant had the whole day to make the payment in advance. But during the day the mortgagee entered and ousted him, and this was a good excuse."

In Curtiss v. Miller, 17 Barb. (N. Y.) 477, 479, action was brought for the rent of a half year which ended April 10, 1846. The surrender occurred on April 2, 1846, only eight days before the expiration of the half year. The court said:

"It is well settled by numerous adjudged cases that, when the term is surrendered before the expiration of a period for which rent accrues, the rent for the whole of such period, not then due, is extinguished, and can neither be distrained for nor collected by action. Bain v. Clark, 10 John. (N. Y.) 424; Shepard v. Merrill, 2 John. Ch. (N. Y.) 280; Bac. Abr. tit. "Rent"; L. Clum's Case, 10 Co. 128; Shep. Touch. 300, 301; Magaw v. Lambert, 3 Pa. 444; Greider's Appeal, 5 Pa. 422; Hall v. Burgess, 5 Barn. & Cres. 332; Grimman v. Legge, 8 Barn. & Cres. 324."

And it denied a recovery.

In Home Life Ins. Co. v. Sherman, 46 N. Y. 370, the rent was payable quarterly, and action was brought for the quarter's rent from May 1, 1867, to August 1, 1867. There had been a surrender in June, 1867, and a recovery was denied.

The payment of the taxes of 1904 was in lieu of rent for that year. This rent was accruing, but the accrual was not complete when the surrender occurred on December 27, 1904, and none of this rent was due or payable before the last day of February, 1905. As the portion of the rent represented by the payment of these taxes had neither accrued nor become due when the surrender was made, the lessees and the surety were thereby released from liability for it, and the court below fell into an error when it overruled the objection to the evidence of these taxes and took them into consideration in estimating the amount which the lessor might recover of the surety.

For this error, the judgment below must be reversed, and the case must be remanded to the Circuit Court, with directions to grant a new trial, and it is so ordered.