In re UNITED CIGAR STORES CO. OF AMERICA (JOSEPH E. OTIS ESTATE LAND TRUST et al., Appellants).*

No. 289.

Circuit Court of Appeals, Second Circuit.

April 6, 1936.

AUGUSTUS N. HAND, Circuit Judge, dissenting in part.

*Rehearing denied —— F.(2d) ——.

Ernst Gale, Bernays & Falk, of New York City (Murray C. Bernays and Henry Gale, both of New York City, of counsel), for estate of Grey and estate of Clarke.

Gould & Wilkie, of New York City (R. L. von Bernuth and D. L. Bugg, both of New York City, of counsel), for General Society of Mechanics and Tradesmen.

Olney & Comstock, of New York City (Irving Smith, Jr., of New York City, of counsel), for Boswell estate.

Clark, Carr & Ellis, of New York City (Joseph F. Mann, of New York City, of counsel), for Arthur D. Hill.

John B. Doyle, of New York City, for Henry J. Sontag and others.

Curtis, Mallett-Prevost, Colt & Mosle, of New York City (Dudley B. Bonsal, of New York City, of counsel), for Beer Realty Co., and Lindner, Inc.

Middlebrook & Sincerbeaux, of New York City (W. E. Shrewsbury, of New York City, of counsel), for estate of Charles Frederick Hoffman.

Lampke & Stein, of New York City (James A. Berry, Jr., of New York City, of counsel), for Adele Rosenthal.

David W. Kahn and Joseph H. Kohan, both of New York City, for Charles E. Nauss and others.

Gilbert, Diamond & Brandeis, of New York City, and Solomon E. Harrison and Benjamin I. Morris, both of Chicago, Ill. (Milton Diamond, Susan Brandeis, Emanuel Feldberg, and Benjamin Pollack, all of New York City, of counsel), for appellants.

Shearman & Sterling and Berle & Berle, all of New York City, for appellees herein, Preferred Stockholders' Protective Committee.

Milbank, Tweed, Hope & Webb, of New York City (Sanford H. E. Freund, H. Struve Hensel, Winthrop H. Kellogg, and Douglas B. Steimle, all of New York City, of counsel), for Phœnix Securities Corporation, intervener herein and owner of a substantial number of shares of preferred stock of the debtor.

Mitchell, Taylor, Capron & Marsh, of New York City, for Landlords' Protective Committee.

Cravath, de Gersdorff, Swaine & Wood, of New York City (Wm. D. Whitney, Donald C. Swatland, and R. L. Gilpatric, all of New York City, of counsel), for reorganization trustee.

Davis, Polk, Wardwell, Gardiner & Reed (Edgar G. Crossman and Edward R. Wardwell, both of New York City, of counsel), for appellee, Debenture Holders' Protective Committee.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

Before the present proceedings were begun by the filing by the debtor of its voluntary petition for reorganization under section 77B, Bankr.Act (11 U.S.C.A. § 207), on June 9, 1934, it had filed a voluntary petition in bankruptcy on August 29, 1932, been adjudicated a bankrupt on the same day in the District Court for the Southern District of New York, and ever since its estate had been administered in bankruptcy by the Irving Trust Company, first as its receiver, and later as its duly qualified trustee. The same trustee is also the trustee in these proceedings.

One of the reasons for the bankrupt's financial difficulties at the time it filed its petition in bankruptcy was the fact that it held numerous parcels of real estate under burdensome leases. There were about one thousand such leases which the trustee found it advisable either to abandon or to modify if more favorable terms could be obtained. Previous to bankruptcy the bankrupt had endeavored to adjust some of the leases and had organized corporations in various states for the purpose of taking them over where suitable arrangements with the lessors could be made. The trustee also made use of such corporations, all of whose stock it owned.

The bankrupt was the owner of a chain of retail stores scattered through a number of states, and the trustee found that its leases generally covered either premises used exclusively by the bankrupt, or a subsidiary, for a retail store or premises partly so used and partly sublet. To meet the various situations, the trustee prepared several forms of lease modification to of-

fer to lessors, and they may be outlined briefly.

One was for use where the bankrupt had been using the premises exclusively for one of its stores and the trustee desired to continue to operate the store. Such an agreement contemplated the assignment of the lease to a local corporation whose stock was all owned by the trustee and the lowering of the rent. The parties to such an assignment were the trustee, the bankrupt, the lessor, and the local corporation who became the tenant. Such an arrangement included the assignment of all the leasehold interest of the trustee and the bankrupt to the new tenant, the decrease of the rent by the lessor, the use of the modified lease as an agreement for use and occupation by the trustee, the payment of the consideration of $1.00 to the lessor, and the release by the lessor of all claims under the lease, either in its original form or as modified, against the Irving Trust Company individually or as receiver or as trustee and also against the bankrupt estate and the bankrupt.

Another was for use where the bankrupt had been using the premises exclusively as a store and the trustee did not desire to continue to operate the store. This provided for the assignment to the lessor by the trustee and the bankrupt of all their interest in the lease and the fixtures and furnishings in the store and for a release to them and to the bankrupt estate by the lessor the same in effect as above noted.

Another was for use where the bankrupt had been using part of the leased premises for a store and subletting the remainder and the trustee did not wish to run the store. That provided for the assignment by the trustee and the bankrupt to the lessor of all their interest in the lease, the subleases, the rents accrued and to accrue under the subleases, and to the fixtures and furnishings in the store the bankrupt had operated. The lessor assumed all the obligations of the trustee and the bankrupt under the subleases, and gave to them and the bankrupt estate a release in like effect as that already mentioned.

Two others were for use together in cases where the bankrupt both occupied part and sublet part and the trustee wished to continue the store. Then one form contained a use and occupancy agreement. The other provided for the assignment by the trustee and the bankrupt of all their interest in the main lease except as it covered the store the bankrupt had used and in the subleases and in all of the rents accrued and to accrue under the subleases; the lessor assumed all the obligations of the trustee and the bankrupt under the lease and subleases, agreed to hold them harmless from any liability thereunder, and gave them and the bankrupt estate a release similar to those already mentioned except as to that portion of the premises used as a store by the trustee and covered by the above-noted use and occupancy agreement.

Another was for use where the bankrupt had leased premises on which it had operated no store but had sublet the property. That provided for the assignment by the trustee and the bankrupt to the lessor of all their interest in the lease and subleases and to rents accrued and to accrue under the subleases, for a release to them and the bankrupt estate from the lessor similar to those already mentioned, and for the assumption by the lessor of all their obligations under the lease and the subleases.

Agents of the trustee made agreements with all the landlords whose claims are here involved which resulted in the execution of one or another of the types of modification of the original leases which have been briefly described. In a few instances, which will be discussed later, a typewritten rider was attached which limited the release given by the landlords. And in two instances the consideration for the execution of the release was solely a cash payment to the landlord.

Of the claims disallowed and expunged, forty-two were based on leases which had, before section 77B was enacted, been so modified as to substitute a subsidiary of the bankrupt as tenant at a reduced rental; twenty-eight on leases so modified as to substitute such a subsidiary as tenant at reduced rental of part of the premises and the landlord took over the remainder; and twenty-four on leases where the landlord took over the entire premises.

For present purposes it will be helpful to put all the claims into two groups: The first, called "A," to include those based on leases which were either modified or assigned to the lessors who accepted the new relationship created and gave general unqualified releases of all claims under the original leases. The second, to be known as class B, in which the general situation

is the same with the exception that the scope of the releases was modified. It is to be noted that in respect to every lease upon which a claim has been filed the lessor had entered into a modification agreement while the original bankruptcy proceedings were pending which materially altered the legal relationship of the parties and in addition had released the trustee, the bankrupt, and the bankrupt's estate either from all obligation under the original leases or from all but what was reserved in some instances by special restricting language. There were twelve thus restricted. One excepted only claims accruing prior to bankruptcy; one expressly provided that the limitation should not apply to "any claim for rent under the lease or for damages in respect thereof"; and a third only related to any claim theretofore filed in the pending bankruptcy proceeding. These three claims obviously stand the same as those in class A for all purposes germane to this appeal, and will be so treated.

The remaining nine claims had riders attached to the article containing the general release providing that:

"Nothing in this article shall be deemed a waiver by the Landlord of the right to prove against the bankrupt estate any provable claims to which the Bankruptcy Court may adjudge the Landlord is entitled, but this shall not be deemed to render any claim a provable one which is not otherwise such or relieve the Landlord from the necessity of proving and obtaining the allowance of any such claim, or preclude the Trustee from contesting such proof and allowance."

The lessors who executed unqualified general releases have sought to avoid their effect by an attempt, so far unsuccessful, to show that they were obtained by some sort of subtle duress whereby the trustee coerced the landlords to give up rights under the leases for the benefit of the bankrupt. Those who signed the modified releases make no such claim, but seek a construction of their releases which will now permit the filing of their claims. Though we are inclined to agree with the court below that no sufficient proof has been made of wrongdoing on the part of the trustee to enable the claimants to avoid the effect of the releases given, decision need not turn solely on the releases except in the two instances where the leases were terminated for a cash consideration

and releases given. None of the lessors question the validity of the modifications of the original leases whereby they accepted a surrender of the leased premises before section 77B was enacted, and all have retained whatever benefit they so received.

As to forty-two claims, the landlords accepted the premises each with a new tenant whom it was agreed the landlord would hold solely liable for performance after September 1, 1932, to which time the rent under the original lease had been fully paid. No rights against the lessee under the original leases were reserved. The effect as a matter of law was to relieve the lessee from any further liability. under the old lease. T. A. D. Jones Co. v. Winchester Repeating Arms Co. (C.C.A.) 61 F.(2d) 774. See Gray v. Kaufman Dairy & Ice Cream Co., 162 N.Y. 388, 56 N.E. 903, 49 L.R.A. 580, 76 Am.St.Rep. 327.

In forty-seven instances the original leases themselves were assigned to the landlords; two of them being assignments by subsidiaries of the lessee to whom assignments had been made before bankruptcy. And three leases were canceled by agreement with the landlords without assignment. In each instance the landlords accepted the surrender of the premises and the right of the lessee to future possession was terminated. That also ended the liability of the lessee for future rent under the leases. In re Sherwoods, Inc. (C.C.A.) 210 F. 754, Ann Cas.1916A, 940; American Bonding Co. v. Pueblo Investment Co. (C.C.A.) 150 F. 17, 9 L.R.A.(N.S.) 557, 10 Ann.Cas. 357. In the two instances where all that was done was to pay cash for a general release of all liability under the lease, the finding that the releases were valid is amply supported by the evidence.

The general releases which were unqualified by riders simply overlapped in blanket form what in legal effect had already been done by the lessors and the debtor in respect to the future rent claims under the leases; that is, no such claims survived the modification agreements to be caught and barred by the general releases. The same is equally true of the agreements containing releases qualified by riders. The riders neither purported to nor did limit in any way the effect of the agreements for lease modification. They simply reserved the right to prove such claims as the bankruptcy court might decide were provable without regard to the

general release. But it was expressly agreed that the landlords should not be relieved 'from "the necessity of proving and obtaining the allowance of any such claim." Clearly the' landlords were left only with the right to prove claims which were not only of the kind which might be held provable in bankruptcy, but were capable of being proved as legal obligations of the bankrupt over any substantive defense which might be made to their allowance.

[4] Under section 77B (b) (10), 11 U.S.C.A. § 207 '(b) (10), landlord's claims for injury from the rejection of an unexpired lease of real estate or for damages or indemnity under a covenant in the lease are to be treated like debts provable under section 63a, 11 U.S.C.A. § 103 (a); the amount allowable not to exceed the rent, without acceleration, reserved for the three years next succeeding the date of surrender to the landlord, unless he has previously reentered when that date is taken' as the base instead, plus unpaid rent then accrued. While it is plain that claims for future rent are provable in 77B reorganization proceedings where they would not have been under the act as it stood previously, it is equally plain that whatever change in this respect was made had to do only with the remedy. It is necessary to have a claim against a debtor which the substantive law of landlord and tenant recognizes as an enforceable claim in order to have a provable claim under section 77B. That section does not extend the liability of a lessee beyond what it otherwise would. be under applicable law. If under such law a landlord would have a claim against a lessee for damages or indemnity under a covenant contained in a lease which would have been recoverable in a civil action had there been no 77B petition approved, such claim may be proved in the 77B proceedings and allowed to the limited extent above indicated. Likewise where an executory contract or an unexpired lease has been rejected pursuant to the direction of the judge in such a proceeding or by a trustee or receiver in bankruptcy or a receiver in equity in a proceeding pending before the 77B petition was filed. But there is no new definition of a claim; only of a creditor. A landlord having a claim under' the applicable state law of the nature set forth in section 77B(b)(10) is a creditor under section 77B with a creditor's rights thereunder, including, of course, the right to prove and have his claim allowed.

It follows that, as none of the claims arose from the rejection of leases and all the original leases upon which they are based were terminated by agreement of the parties before these proceedings were instituted and, indeed, before section 77B was passed, and the leased real estate surrendered to and accepted by the landlords without any reservation of rights under the leases against the lessee, this debtor, the lessors, have no valid claims for future rent.

The issue here is not one of the provability of actual claims for future rent, but rather one of recognition that the claimants have no claims at all against the debtor or its estate. Before 77B, a bankrupt might be left liable to a landlord because a valid ·future rent claim was not provable against his estate and so not dischargeable. Now a debtor will be relieved from future liability on such claims since they are provable under 77B, but nothing has been done to bring into being substantive rights, before nonexistent, to form the basis of provable claims.

Order affirmed.

AUGUSTUS N. HAND, Circuit Judge (dissenting in part).

I concur in the opinion of Judge CHASE except as to the claims covered by the qualified releases. In all the other cases the unqualified releases barred the claims here sought to be proved by the landlords. Three claims in which there were qualified releases but which are not among the nine first mentioned, namely, Nos. 5241, 5281, and 5287, did not reserve rights to future rent. The nine claims as to which I dissent are all asserted in cases in which the original leases were modified by agreement of the parties prior to the enactment of section 77B of the Bankruptcy Act (11 U.S.C.A. § 207)' and in which the landlords had accepted surrender of the demised premises pursuant to the agreements. In the agreements there were not only modifications or assignments to the landlord by the trustee and the bankrupt of all their interest in the leases but also general releases by the landlords of all claims against the trustee, the bankrupt, and the bankrupt estate. There were, however, riders attached to. each instrument in substantially the following form qualifying the releases:

"Nothing in this Article shall be deemed a waiver by the Landlord of the right to

prove against the bankrupt estate any provable claims to which the bankruptcy court may adjudge the Landlord is entitled, but this shall not be deemed to render any claim a provable claim which is not otherwise such or relieve the Landlord from the necessity of proving and obtaining the allowance of any such claim, or preclude the trustee from contesting such proof or allowance."

Now this rider, which is part of the same instrument that contained the general release and so modified the relation of landlord and tenant as to bring about a surrender, cannot be regarded as an instrument which did not "limit in any way the effect of the agreements for lease modifications." The prevailing opinion is based upon the theory that the rider did not involve any alteration of the rights of the parties to future rent claims as they would have stood if it had never been added to the agreement. Such an interpretation of the acts and written memorials embodying their understandings contradicts the purpose of the rider. It is said in the opinion that the leased real estate was "surrendered to and accepted by the landlords without any reservation of rights under the leases against the lessee. * * *" But that, I think, is not at all what was done. Not only did the statement in the rider that there was no "waiver by the Landlord of the right to prove against the bankrupt estate any provable claim" limit the general release, but the rider cannot have the meaning intended unless it be taken to reserve against the bankrupt's estate any claims which existed but for the surrender and general release. Indeed, this is exactly what the master found to have been the intent of the parties who made the agreements; and the trustee and the debenture bondholders have conceded the purpose of the qualified releases was to reserve future rent claims for judicial determination. See Trustee's Brief, pp. 11, 29, 37; Debenture Bondholders' Brief, pp. 12, 13.

The master held that the future rent claims contemplated as provable were those that might have been proved had the decision of the Supreme Court in Manhattan Properties, Inc., v. Irving Trust Co., 291 U.S. 320, 54 S.Ct. 385, 78 L.Ed. 824, gone the other way and allowed proof of claims for future rent. But remedial legislation as to such claims was already before Congress when the agreements were made, and the riders nowhere limited claims which might be proved to those that the law then allowed. The riders specified "any provable claims to which the bankruptcy court may adjudge the Landlord is entitled." This, I think, embraced any claims which might then be provable or which might become provable through subsequent legislation. The enactment of section 77B as an amendment of the existing Bankruptcy Act allowed proof of future rent claims to a limited amount, and these the nine claimants should be allowed to prove. I can see no distinction between a provability arising from legislative sanction and provability arising from judicial decision.

I would add that the effect of the assignments and surrenders was not litigated in the court below, which considered only the effect of the releases and interpreted them as reserving merely such claims for future rent as might be proved in bankruptcy prior to the enactment of section 77B.

The order so far as it affected the nine claims I have mentioned should be reversed, and proof of these claims should be allowed in the 77B proceeding.