ACCUMULATOR CO. v. DUBUQUE ST. RY. CO.

(Circuit Court of Appeals, Eighth Circuit. September 24, 1894.)

No. 391.

1. SALE—INTERPRETATION OF CONTRACT—"GUARANTY" AND WARRANTY.
   Plaintiff made written proposals to defendant, a street-car company, to furnish a trial car with electric storage batteries, to be operated by defendant for 60 days, and, if not then shown to be unsatisfactory, plaintiff was to furnish additional storage-battery equipments at specified prices. Accompanying these proposals was a letter wherein plaintiff agreed that in the event the equipments were furnished under the proposals "we will guaranty for a period of four years * * * that the cost of renewal of batteries * * * shall not exceed $2.50 per year," on the cars at plaintiff's factory, etc. *Held*, that this so-called "guaranty" was not an independent collateral undertaking, nor a mere guaranty of indemnity against loss which required defendant to operate the system four years before an action could be maintained for a breach, but, on the contrary, should be interpreted, under the circumstances of the sale, as a part of the contract, and as amounting to a warranty of the character and durability of the batteries.

2. SAME—"CONDITIONS" AND WARRANTIES.
   A contract for furnishing storage-battery equipments for street cars. after specifying the machinery, terms of payment, and various stipulations, further provided that "the plant will be considered satisfactory if it fulfills the following conditions." Among the conditions enumerated were that each car should run 12 miles an hour over a suitable track, carrying 50 passengers; that with additional battery cells it should draw a trailer, loaded to a given weight; that a set of batteries once fully charged should propel a car 25 miles, etc. *Held*, that these provisions were not merely conditions under which the vendor might compel the acceptance of the equipment, and which were waived by an acceptance, but were warranties for the breach of which damages could be recovered.

3. SAME—DEFENSE OF BREACH OF WARRANTIES—EVIDENCE.
   Plaintiff contracted to furnish defendant with one storage-battery street car, to be operated for 60 days on trial, and if it was not then shown to be unsatisfactory they were to furnish a number of storage-battery equipments for other cars, with certain warranties as to amount of work, durability, etc. The trial car was accordingly furnished, and was operated for 60 days. No complaint was made of

its performance, and plaintiff then furnished the other equipments, and afterwards sued for the price thereof. Defense was made on the ground of failure of the equipment to fulfill the warranties. *Held,* that as the warranties did not go into effect until the trial car had performed its functions, plaintiff was not entitled to show that that car failed in the same particulars as the equipments subsequently furnished.

4. SAME—BREACH OF WARRANTIES—CONSEQUENTIAL DAMAGES.

Expenses incurred by a street-car company in constructing shifting devices necessary for the installation of a storage-battery system are recoverable as damages against the vendor of the storage-battery plant, when the warranties contained in the contract of sale are broken to such an extent that the system is an utter failure, and the company is compelled to abandon it, and the shifting devices then become useless.

In Error to the Circuit Court of the United States for the Northern District of Iowa.

This was an action upon a contract to recover $48,886.89, the purchase price of certain machinery, material and services which constituted an electrical equipment for operating the Dubuque Street Railway by the storage-battery system. The defense was that the plaintiff, the Accumulator Company, failed to comply with its contract as to the character and efficiency of the equipment, to the damage of the defendant, the Dubuque Street Railway Company, in an amount in excess of the purchase price. There was a verdict and judgment for the defendant, and this writ of error is brought to reverse that judgment.

The contract on which the suit was based consisted of a proposal dated and accepted July 30, 1890, and a letter from the vendor to the railway company of the same date. The parts of the proposal material to the questions presented for our consideration are as follows:

"New York, June 30th, 1890.

"Dubuque Street Railway Company, J. A. Rhomberg, President, Dubuque, Iowa—Dear Sir: In conformity with our verbal understanding to-day we beg to make herewith the following proposal: We will deliver f. o. b. Philadelphia, one (1) trial car, sixteen (16) feet long, with two (2) ten (10) horse power motors, and two (2) sets of storage batteries, together with complete charging equipment, such as you have seen at 23rd and Brown Sts., Philadelphia, for your use in Dubuque, and we will send an expert to supervise the running of it during a period of sixty (60) days. Our experience with this trial car renders us certain that the guaranty will be performed to your satisfaction, and if at the end of the sixty days, to wit, on or before the first day of October, 1890, we do not receive proof to the contrary, then the balance of this contract, covering purchase of six (6) car equipments, with the option of nine (9) car equipments additional, at the same price, shall go into full effect. If at the end of the said sixty (60) days the trial car shall have failed in any important particular to perform the specified service, then and in that case you shall notify us promptly on or before the last day of the said sixty (60) days, and you shall return the trial car and equipments in good order to us. You are to pay us three hundred dollars ($300.00), being intended to cover half of all the expenses of the transportation both ways of this trial car, and also the expenses of the expert from the time he leaves Philadelphia until his return from Dubuque. If the balance of this proposal for six (6) car equipments or more does not take effect as above provided, at the end of the sixty (60) days, then you are to pay us a further sum of three hundred dollars ($300.00), which is intended to cover the balance of the above-described expenses, and return the car, etc., to us in good order. If at the termination of the said sixty (60) days, or sooner, at your option, the balance of this contract shall come into effect as above provided, we will supply you with not less than six (6) car equipments, as described in the accompanying specifications, for the sum of eighteen hundred dollars ($1,800.00) cash f. o. b. cars Philadelphia, and not less than one hundred (100) cells per car of the '23M' type,

together with all necessary connections, crates, &c. (the crates to have suitable automatic connections), at twelve dollars ($12.00) per cell, including the cost of the crates f. o. b. cars at our factory, Newark, N. J. * * * We will also supply two (2) reserve armatures of 25,000 watts each for the sum of one thousand dollars ($1,000) f. o. b. Philadelphia. You will supply necessary power, suitable location for plant, and will erect the shifting devices from our drawings, and will also furnish all the labor necessary for the installation of the plant. * * * If the above-mentioned trial car is not returned within sixty (60) days, this company is to proceed at once with the filling of the rest of the order, not less than six (6) car equipments, together with all the rest of the above-mentioned equipments, and including at least one hundred (100) cells of battery per car, which are to be delivered f. o. b. Philadelphia or Newark, N. J., within ninety (90) days after the expiration of the before-mentioned period of sixty (60) days. * * *

"The plant will be considered satisfactory if it fulfills the following conditions: 1st. * * * 2nd. That each car will run twelve (12) miles an hour on a straight, level, and suitable track in good order, when carrying fifty (50) passengers, or an equivalent weight, not exceeding 6,000 lbs., and, if provided with additional cells, will draw a trailer weighing, loaded, not exceeding 6,000 lbs. 3rd. * * * 4th. * * * 5th. That two sets of batteries per car shall be delivered, either of which, when fully charged, shall be capable of propelling the car as above on a practically level track for a distance of twenty-five (25) miles, if required, when it shall be replaced by the reserve battery, which meanwhile shall have been fully charged. Each battery can be charged while its alternate is being used. 6th. That the batteries, when treated according to printed instructions, and their parts renewed as required, will remain in efficient condition. 7th. That all manufactures of this company being intended to be first-class in every respect, any defects of workmanship, material, or design (ordinary wear and tear excepted) of which due notice shall be given by the customer to this company within one year of the date of delivery shall be corrected by us promptly without charge."

On the same day that this proposal was dated and accepted, and as a part of the same transaction, the vendor delivered to the railway company the following letter:

"New York, June 30th, 1890.

"(Strictly Confidential.)

"Dubuque Street Railway Company, J. A. Rhomberg, President, Dubuque, Iowa—Dear Sir: In connection with our proposal of even date herewith which has been duly accepted by you, we hereby agree that, in the event of the electric car equipment therein referred to being supplied to you by this company, we will guaranty for a period of four (4) years from the date of installation thereof that the cost of renewals of batteries for the service proposed shall not exceed an average of two dollars and fifty cents ($2.50) per cell per annum f. o. b. cars at our factory, Newark, N. J. (the old piles being returned to us, freight and charges paid), provided the said batteries are used in accordance with the printed instructions, a copy of which will be posted by you conspicuously in the engine house, battery house, and the drivers' platform, and which instructions will form part of this guaranty. This guaranty is to be construed so as to exclude all damage or deterioration due to accident, malice, neglect, or act of God."

The trial car was furnished and operated by the plaintiff for 60 days, and no notice was given by the railway company that it failed in any important particular. Thereupon the Accumulator Company furnished an electrical equipment under the contract, and the railway company received it, and proceeded to operate its cars with it. The operation of street cars by means of storage batteries was an experiment, and there was evidence tending to show that in this case it was a very disastrous experiment; that although by a subsequent modification of the contract each car was provided with 160 cells (80 in operation and 80 being recharged), instead of the 100 (50 in operation and 50 being recharged) specified in the original contract, the equipment failed to comply with the contract in the following

essential particulars: First, the electric power supplied by a battery of 80 cells was insufficient to propel a car at the speed of 12 miles an hour on a straight, level, and suitable track, in good order, and to carry 50 passengers, or an equivalent weight not exceeding 6,000 pounds; second, the electric power such a battery supplied would not draw a trailer weighing, loaded, not exceeding 6,000 pounds, on such a track; third, the electric power supplied by such a battery was incapable of propelling a car 25 miles, or more than 19 miles, on a practically level track, without recharging; and, fourth, the cost of renewing the batteries at the market price was on the average more than $5 per cell per annum. There was evidence to the effect that the failure of the equipment to comply with the contract in these particulars was so radical that it was worthless for the purpose of operating street cars, and that the railway company was compelled to abandon the use of it at the end of a year, and to substitute the trolley system. In order to set this storage-battery system at work, the railway company was compelled to provide a transfer table and a charging table, and to prepare an extra room in which the cells could be washed, at an expense of some $2,000, and this room and these tables became useless to it and worthless when it was compelled to abandon this system. The jury, under the direction of the court, allowed the defendant as its damages for the vendor's failure to furnish the equipment called for by this contract the sum of $2,000 for its loss on this room and these tables, and also the difference between the value of the electric equipment furnished and that agreed to be furnished. The errors assigned relate principally to the rulings of the court relative to the measure of the defendant's damages, and are stated and considered in the opinion.

Francis B. Daniels, for plaintiff in error.

D. E. Lyon (D. J. Lenehan, on the brief), for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge, after stating the facts as above, delivered the opinion.

In answer to this action for the purchase price of machinery and supplies the defendant pleaded and recovered as a counterclaim the damages which resulted to it from the failure of the plaintiff to furnish an electric equipment of the character described in the contract of sale. The subject-matter of the contract was the necessary machinery and supplies to operate the Dubuque Street Railway by electricity through the use of the storage-battery system. In the operation of this system batteries charged with electricity are placed upon the cars, and used to propel them until the electricity is exhausted, when they are removed, recharged, and replaced upon the cars to propel them again. The use of the batteries gradually disintegrates their positive plates until it becomes necessary to renew them. The cost of each renewal was about $2.50 per cell, and the commercial value of such an electric equipment as was described in this contract depends largely upon the durability of the plates and the amount of power the batteries will supply from a single charge. June 30, 1890, the vendor submitted to the defendant a proposal to furnish the equipment in question, which, together with a letter of the same date, contained the terms of the contract subsequently concluded between them. In that letter the vendor wrote as follows:

"In connection with our proposal of even date herewith, which has been duly accepted by you, we hereby agree that, in the event of the electric car equipments therein referred to being supplied to you by this company, we

will guaranty for a period of four years from the date of installation thereof that the cost of renewals of batteries for the service proposed shall not exceed an average of two dollars and fifty cents ($2.50) per cell per annum f. o. b. cars at our factory, Newark, N. J. (the old piles being returned to us, freight and charges paid)."

It is assigned as error that the court below held that this was a warranty of the durability of the batteries, and charged the jury in effect that if the batteries furnished required renewals so frequently that the average cost for the four years would exceed $2.50 per cell per annum, there was a breach of the contract, and the vendee might recover the difference between the value of the machinery had it met the requirements of the contract and its value in the condition in which it was actually delivered to the vendee. The contention of the plaintiff is that this letter "is not in any sense a warranty of the character of the equipment, but is an independent collateral undertaking in the nature of a contract of indemnity against loss arising to the intending purchaser from the cost of renewals exceeding the figure therein named, which indemnity, however, shall not be paid for a period exceeding four years from the date of the contract."

There are no rules for the construction of contracts more salutary in their operation or more universal in their application than that (1) the court may put itself in the place of the contracting parties, and then, in view of all the facts and circumstances surrounding them at the time of the execution of the instrument, consider what they intended by the terms of their contract; and (2) that when the intention is manifest it will control in the interpretation of the instrument, regardless of inapt expressions and technical rules of construction. Let us apply these rules to this contract. When it was made—in 1890—the vendor was a corporation engaged in promoting the business of propelling street cars by electricity supplied by storage batteries, and in furnishing the necessary machinery and electric equipments for that purpose. The vendee was a street-railway company engaged in operating its railroad by animal power. The vendor desired the railway company to purchase its machinery and supplies, and to substitute the storage-battery system for its animals. The use of that system was an experiment. It had not been sufficiently tested to ascertain its commercial value. The vendor doubtless had all the knowledge and experience of its character and practicability that had then been attained, and had complete confidence in its success. The railway company knew little or nothing about it, save the statements of the vendor; but it was anxious to buy the necessary machinery and supplies to substitute for its animals a power that would prove the least expensive in the operation of its railroad, and yet was unwilling to take upon itself the risk of any experiments. Under these circumstances the vendor proposed to sell to the railway company carefully specified machinery and supplies to operate its railway by the vendor's system for a certain price. About this price there seems to have been no question, but the railway company was evidently determined to be assured how much power the plant the vendor pro-

posed to furnish would supply, and how expensive its operation would be before it closed the contract. It was evident to the vendee that the durability of the batteries and the amount of power they would supply from a single charge conditioned the expense of operation and measured the value of the equipment. To assure the defendant that the operation of the plant would be inexpensive, and the machinery valuable, the vendor declared in its proposal that it would send a trial car and an expert to Dubuque, and would there operate this car for 60 days, and that if during this time it failed in any important particular to fulfill the terms of the proposal submitted, the defendant could then exercise its option to conclude the contract or reject the proposal. In this proposal it declared that the character of the plant it proposed to furnish was such that a street car supplied with 50 cells would run 12 miles an hour on a straight, level track, and carry 50 passengers, or 6,000 pounds; that if provided with additional cells it would draw a trailer weighing, loaded, 6,000 pounds, and that the batteries it proposed to supply to each car would, when charged, propel it on a practically level track a distance of 25 miles without being recharged. This was well. This was a proposal to warrant the quantity and efficiency of the power a single charge would supply to the batteries, but it was evidently insufficient to induce the defendant to purchase. It left in doubt and unguarded the crucial test of the value and availability of the equipment,—the durability of the batteries. If they would endure but a month, the plant was worse than worthless, if a year, it was well worth the price. To assure the defendant of the durability of these batteries, and to induce it to conclude the contract, the vendor, on the same day that it made the proposal, wrote the letter of June 30th, and there agreed that if it furnished the equipment proposed it would guaranty that the cost of the renewals of the batteries should not exceed an average of $2.50 per cell per annum during the term of four years. It is said that this was an independent collateral undertaking. But how can that be? It was written and delivered on the same day as was the proposal. The proposal expressly provided that the contract of purchase should not be concluded until the trial car had been sent to Dubuque, and operated for 60 days, and that it should then be at the option of the defendant to close or reject it in case the car failed in any important particular. The trial car was sent to Dubuque, and was operated for the 60 days. No complaint was made of its operation, and the contract of purchase was then closed according to the terms of the proposal by the silence of the defendant. The proposal and the letter together awaited for at least 60 days the acceptance or rejection of the offer to the defendant they contained, and at the end of that time together they became the terms of the contract of purchase it accepted. Neither was independent of nor collateral to the other. Each contained some of the terms of a single offer to sell and of a single contract of sale.

Nor are we able to persuade ourselves that this was a mere guaranty of indemnity against loss from the cost of the renewals that required the defendant to operate this system four years before

an action could be maintained for its breach.    That these parties used the word "guaranty," and not the word "warrant" in this contract is entitled to slight, if any, consideration in view of the facts and circumstances surrounding the parties and their manifest intent in making the contract.    Their officers were doubtless business men, not lawyers, and the somewhat technical distinction in the significance of the two words ought not to be permitted to defeat the plain intention of the parties.    If it had been their intention to make a contract that the vendor would renew these batteries as required for four years at an average expense of $2.50 per cell per annum, it would have been easy and natural that they should have so written the agreement.    They did not do so. Evidently that was not their intention; that was not the contract in the minds of the parties.    In the sixth paragraph of the proposal the vendor covenanted that when the parts of the batteries were renewed as required they would remain in efficient condition.    Evidently this was not a sufficient warranty of efficiency to induce the railway company to purchase.    The parties knew the cost of the renewals, but the question was how often would renewals be required,—how durable would the batteries be?    And that was the crucial question that determined the practicability and value of the plant.    The guaranty that the cost of the renewals would not exceed $2.50 per cell per annum on an average during four years was an answer to this question.    It was but the practical method the vendor adopted to express its manifest intention to warrant the batteries to be furnished to be so durable that they would require renewal on an average of about once a year.    It certainly was not the intention of the defendant to pay nearly $50,000 for the privilege of making an experiment for four years under the guaranty of another corporation.    It was not experiments or guaranties of corporations, but an efficient and practical electric equipment that would be comparatively inexpensive in operation, that this defendant evidently insisted upon purchasing, and that every line of the contract and all the surrounding circumstances show the vendor was anxious to sell and willing to warrant, and that it did warrant, that the defendant should receive.    It is incredible that either party intended that this vendee should pay more than $48,000 for the privilege of being compelled to operate this experimental equipment for four years, regardless of expense, before it could avail itself of this provision of the contract relative to the durability of the batteries, relative to the one characteristic of this plant which more than any other conditioned the value or worthlessness of the equipment.    In our opinion, the court below committed no error in its ruling here, but construed this provision of the contract in accordance with the manifest intention of the parties when it held it to be a warranty of the character and durability of the batteries.

It is also assigned as error that the court below held that the provisions of the contract that each car should run 12 miles an hour over a suitable track when carrying 50 passengers or 6,000 pounds; that with additional cells it should draw a trailer weighing, loaded, not exceeding 6,000 pounds; that a set of batteries, when fully

charged, should be capable of propelling a loaded car over a distance of 25 miles without being recharged, and that the batteries, when properly treated and renewed, should remain in an efficient condition,—which are found in the original proposal among the "conditions" following the clause that "the plant will be considered satisfactory if it fulfills the following conditions,"—were warranties that the equipment would comply with these conditions, for the breach of which the defendant could recover its damages. It is contended that these provisions simply specified the conditions under which the vendor might compel the acceptance of the equipment, and that an acceptance and use of it by the vendee waived these conditions, and left the purchaser remediless for the breach of them. An interpretation so narrow and technical would prevent the accomplishment of the plain intention of these parties. The only description or affirmation of the quality and efficiency of the equipment sold is found in these conditions and in the letter we have already considered. The same considerations which led to the inference that the agreement in that letter was a warranty of the durability of the batteries compel the conclusion here that these provisions in the proposal were affirmations of the character and efficiency of the plant offered, and when the proposal was accepted they became warranties of its quality. The statement that the plant would be considered satisfactory if it fulfilled the specified conditions was but a convenient method of stating that the plant proposed to be furnished would possess the qualities and efficiency there described. These affirmations were clearly intended to induce, and undoubtedly they did induce, the purchaser to buy the plant; and affirmations of the essential qualities of goods sold made by the vendor and relied upon by the vendee in the purchase constitute warranties. English v. Commission Co., 6 C. C. A. 416, 57 Fed. 451; Hastings v. Lovering, 2 Pick. 214; Henshaw v. Robins, 9 Metc. (Mass.) 83; Latham v. Shipley (Iowa) 53 N. W. 342; Richards v. Grandy, 49 Vt. 22; Beals v. Olmstead, 24 Vt. 114; Bryant v. Crosby, 40 Me. 9; Thorne v. McVeagh, 75 Ill. 81; Polhemus v. Heiman, 45 Cal. 573; Callanan v. Brown, 31 Iowa, 333.

Complaint is made that the circuit court refused to permit the plaintiff to prove that the trial car failed in quality and efficiency in the same particulars in which those failed which were operated under the equipments subsequently furnished, and withdrew from the jury the consideration of the acts and omissions of the parties relative to that car. The trial car was furnished and operated for 60 days, under the supervision of the vendor, to demonstrate to the defendant the practicability of the system, and to induce it to make the contract of purchase. It was not operated to inform the vendor regarding the equipment it proposed to sell. The vendor was already fully informed. In its proposal it declares:

"Our experience with this trial car renders us certain that the guaranty will be performed to your satisfaction, and if at the end of the sixty days * * * we do not receive proof to the contrary, then the balance of this contract, covering purchase of six (6) car equipments, * * * shall go into full effect."

The warranties in the contract of purchase, then, did not go into full effect until the trial car had performed its function. Then the silence of the defendant accepted the proposal and closed the contract. It was certainly no defense to the breaches of the warranties in that contract that the trial car did not comply with their terms before the contract that contains them took effect, and the ruling of the court below upon this subject was right.

It is assigned as error that the circuit court allowed the defendant to prove that a car equipped with 80 cells would not draw a loaded trailer weighing not more than 6,000 pounds, on the ground that the vendor covenanted that it would draw such a trailer only when provided with additional cells. It is a conclusive answer to this assignment that when the contract was made it warranted that a car supplied with 50 cells would, when provided with additional cells, draw a loaded trailer, and each of the cars that the evidence tended to show was incapable of drawing a trailer had been provided with 30 additional cells, so that it carried 80.

Another supposed error assigned is that the court charged the jury that if the plant furnished failed to such a degree that the defendant was justified in abandoning the use of it, and, in order to set the storage-battery system at work, the defendant was required in the first instance to furnish a transfer table and a charging table, and to prepare another room for the purpose of having the cells washed, and if, when it abandoned the system, these articles ceased to be of any further use or value to it, they might allow to the defendant as damages the difference between the cost of furnishing these articles and their value after the abandonment of the storage-battery system, in addition to the difference between the value of the electric equipment actually furnished and that agreed to be furnished, which the judge had authorized them to allow as general damages for the breaches of the warranties. The proof was plenary that the defendant had necessarily incurred an expense of several thousand dollars in constructing these shifting devices in order to install the plant the vendor furnished, that the plant failed so utterly that the defendant was compelled to abandon it, and that the shifting devices then became worthless and useless. The vendor was aware when this contract was made that it would be necessary for the defendant to construct these devices. Indeed, it expressly provided in its proposal that the defendant should erect them from the vendor's own drawings, and should furnish all the labor necessary for the installation of the plant. If the vendor had furnished an electric equipment of the character it contracted to furnish, the shifting devices would have been useful and valuable, and the cost of constructing them would not have been lost to the defendant. The railway company's loss of this cost was the direct, natural, and inevitable result of the vendor's disastrous failure to comply with its contract, and it was a loss in addition to the difference between the equipment furnished and that which the vendor agreed to furnish. No sound reason occurs to us why the defendant should not be permitted to recover it. Compensation for pecuniary loss that is the direct, natural, and immediate con-

sequence of a breach of warranty is both the just and legal measure of a purchaser's damages. The rule is well settled that the damages recoverable of a manufacturer for the breach of a warranty of machinery which he contracts to furnish and place in operation for a known purpose are not confined to the difference between the machinery as warranted and as it proves to be, but include such consequential damages as are the direct, immediate, and probable result of the breach. The charge of the court was in accordance with this rule. It was just and clear. It commends itself to the judgment, and is amply sustained by the authorities. 3 Pars. Cont. (7th Ed.) p. 212; 2 Suth. Dam. § 672; Mining Syndicate v. Fraser, 130 U. S. 611, 622, 9 Sup. Ct. 665; Poland v. Miller, 95 Ind. 387; Sinker v. Kidder, 123 Ind. 528, 530, 24 N. E. 341; Swain v. Schieffelin, 134 N. Y. 471, 31 N. E. 1025; Passenger v. Thorburn, 34 N. Y. 634; Ferris v. Comstock, Ferre & Co., 33 Conn. 513.

One hundred and eighteen supposed errors are assigned in the record of this case. We have carefully considered them all, and are of the opinion that they disclose no substantial error in the trial below. We have discussed the more important questions they present, and indicated the reasons for the conclusions we have reached upon them. Most of these supposed errors relate to the questions we have considered, and no good purpose would be served by extended notice of the remainder. The judgment below must be affirmed, with costs, and it is so ordered.