BARNSDALL OIL CO. v. LEAHY et al.

(Circuit Court of Appeals, Eighth Circuit. April 1, 1912.)

No. 3,682.

*(Syllabus by the Court.)*

1. CONTRACTS (§ 147*)—CONSTRUCTION—INTENTION OF PARTIES THE DESIDERATUM.

The purpose of a written agreement is to record the intention of the parties.

The object of all construction is to ascertain and enforce the intention of the parties, the sense and meaning of the words they used upon which their minds met when they made it, and the court should, so far as possible, put itself in the place of the parties to find this intention.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 730, 743; Dec. Dig. § 147.*]

2. CONTRACTS (§ 154*)—MORE REASONABLE AND PROBABLE MEANING PREFERRED.

Where the language of a contract is obscure or ambiguous, or its meaning doubtful, so that it is susceptible of two constructions, that interpretation which is the more natural, probable, and reasonable should be adopted.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 735; Dec. Dig. § 154.*]

3. MINES AND MINERALS (§ 73*)—OSAGE MINING LEASE—"CULTIVATED INCLOSURE" THEREIN INCLUDES ONE MADE SUBSEQUENT TO LEASE.

The term "cultivated inclosure" in the clause of the mining lease made by the Osage Nation on March 16, 1896, to Foster, which prohibits boring wells on the Osage Indian reservation for oil and gas on such inclosures, includes those made after as well as those which were in existence at the date of the lease.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 201, 210; Dec. Dig. § 73.*]

4. MINES AND MINERALS (§ 73*)—LESSEE MAY OPERATE UNCULTIVATED PART OF "CULTIVATED INCLOSURE."

An inclosure which contains a cultivated tract and an uncultivated tract is a cultivated inclosure, and the lessee may not prospect or bore wells on the former, but he may do so on the latter if his operations do not unnecessarily interfere with the use of the cultivated tract for agricultural purposes.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 201, 210; Dec. Dig. § 73.*]

5. MINES AND MINERALS (§ 73*)—UNCULTIVATED TRACTS—CULTIVATOR AGAINST
  LESSEE OF MINING PRIVILEGE—PRIOR PROCEEDING GIVES SUPERIOR RIGHT.
    Between the cultivator of the land and the lessee of the mining privi-
  lege, he who first, by an open and notorious act in good faith commences,
  and with diligence, proceeds to subject an uncultivated tract to his use,
  has the superior right to it. His subsequent acts relate back to the in-
  itiation of his proceeding.
    [Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 201,
  210; Dec. Dig. § 73.*]

Appeal from the Circuit Court of the United States for the West-
ern District of Oklahoma. ·

Bill by the Barnsdall Oil Company against Edward A. Leahy and
others. From a decree dismissing the bill, plaintiff appeals. Affirmed.

James W. Zevely (John L. Hays and James M. Givens, on the
brief), for appellant.

T. J. Leahy (E. E. Grinstead and Paul B. Mason, on the brief), for
appellees.

Before SANBORN, ADAMS, and CARLAND, Circuit Judges.

SANBORN, Circuit Judge. The Barnsdall Oil Company, a corpo-
ration, appeals from a decree of dismissal of its bill against Edward
A. Leahy, an Indian allottee, and J. W. Rodgers, his tenant, of 120
acres in the Osage Indian reservation, brought to enjoin them from
preventing the Oil Company from boring or drilling wells for the
production of oil on this land which the defendants insist was a "cul-
tivated inclosure." The Oil Company had, by virtue of mesne con-
veyances, the same rights to prospect for, drill, and bore wells upon
this real estate that Edwin B. Foster would have had under the lease
made by the Osage Nation to him on March 16, 1896, and its subse-
quent extension, if he had not parted with any of his rights thereun-
der.

The congressional authority to make the lease to him provided:

"That where lands are occupied by Indians who have bought and paid for
the same and which lands are not needed for farming or agricultural pur-
poses and are not desired for individual allotments, the same may be leased
by authority of the Council, speaking for such Indians, for a period of not
to exceed five years, for grazing, or ten years for mining, purposes, in such
quantities and upon such terms and conditions as the agent in charge of such
reservation may recommend, subject to the approval of the Secretary of the
Interior." Act Feb. 28, 1891, c. 383, 26 Stat. 794.

The resolution of the National Council of the Osage Nation, which
empowered its chief to make the lease, recites that Foster—

"has made application to the Osage National Council for the privilege of pros-
pecting and boring for petroleum and natural gas upon the Osage reservation
and proposes to enter into a contract for that purpose upon terms that will
not be detrimental to the agricultural interests of the country and which
would increase the revenue and enhance the value of our common property
should such prospecting result in the discovery of said petroleum or natural
gas."

The Osage Nation by its contract of March 16, 1896, leased to
Foster for the term of 10 years, and, as to the land here involved this

term was extended 10 years by Act March 3, 1905, c. 1479, 33 Stat. 1061, all the land in Osage Indian reservation for the purpose of prospecting for, boring, or drilling wells for mining and producing petroleum and natural gas. That lease contained this agreement:

"And it is further mutually agreed and understood by and between the parties hereto that the Osage Nation reserves all right it hath, and its citizens have, to cultivate, graze, and improve, and to lease for farming, grazing, and mining purposes, other than for the mining purpose herein named, all and every part of the lands contained in said reservation, subject to the limitation herein contained, and such right shall not be interfered with or disturbed by the party of the second part, his heirs, executors, administrators or assigns, except to such an extent as may be actually and absolutely necessary in prospecting for and in conducting and marketing the products herein named; and said second party and those acting under, through or by him shall not prospect for or drill or bore any wells for the production of the substances herein mentioned within or upon any cultivated enclosure on said reservation without the written consent of the person occupying such premises, duly acknowledged before the U. S. Indian agent of the Osage agency."

The controversy in this case springs out of the last clause of this quotation. Prior to January, 1911, but long after March 16, 1896, the defendants had inclosed their 120 acres with a fence and had cultivated about 60 acres of the southern and eastern part of it, and they had built a house upon it in which the tenant was living. In the early part of the year 1911 the defendants cleared, grubbed, and plowed some of the northwestern part of the land, and the complainants surveyed and staked some of this land for wells and placed timber upon it for the purpose of drilling or boring wells thereon for the production of oil. The defendants removed this timber from the land, and forbade and prevented the complainant from sinking any wells upon or producing any oil from it. After a final hearing of this suit upon the merits, the court below was of the opinion that the land was a cultivated inclosure, and that the complainant was without right to prospect for or bore wells upon it under the lease. Complaint is made of this ruling upon two grounds: That the inclosures that were cultivated at the time the lease was made on March 16, 1896, only, are excepted from the grant of the lessee's right to sink wells for oil and gas, and this land was not cultivated until years after that date, and that the evidence does not sustain the finding of the court below that the part of the land on which the complainant located and endeavored to bore its wells was a cultivated inclosure, or any part of such an inclosure.

Whether or not inclosures brought under cultivation subsequent to the date of the lease are excepted from its grant to Foster of the right to bore and operate wells for oil and gas must be determined by a consideration of the terms of the contract, the circumstances of the parties when it was made, and the comparative reasonableness of the two possible interpretations of its words. The purpose of every written agreement is to record the intention of the parties. The object of all construction is to ascertain what that intention was and to enforce it. The court should, so far as possible, put itself in the place of the parties when their minds met upon the terms of the agreement, and then from a consideration of the writing itself, of its pur-

pose and of the circumstances under which it was made, endeavor to ascertain what they intended to agree to do, upon what sense and meaning of the terms they used their minds actually met. Accumulator Co. v. Dubuque St. Railway Co., 12 C. C. A. 37, 41, 42, 64 Fed. 70, 74, 75; Salt Lake City v. Smith, 43 C. C. A. 637, 642, 104 Fed. 457, 462; Fitzgerald v. First National Bank of Rapid City, 52 C. C. A. 276, 284, 114 Fed. 474, 482; American Bonding Company v. Pueblo Investment Co., 150 Fed. 17, 27, 80 C. C. A. 97, 107, 9 L. R. A. (N. S.) 557, 10 Ann. Cas. 357; Pressed Steel Car Co. v. Eastern Ry. of Minnesota, 57 C. C. A. 635, 637, 121 Fed. 609, 611.

Where the language of a contract is contradictory, obscure or ambiguous, or its meaning is doubtful, so that the agreement is fairly susceptible of two constructions, the more natural, probable, and reasonable interpretation should be adopted. Bell v. Bruen, 1 How. 169, 186, 11 L. Ed. 89; Pressed Steel Car Co. v. Eastern Ry. Co. of Minnesota, 57 C. C. A. 635, 637, 121 Fed. 609, 611; American Bonding Company v. Pueblo Investment Company, 80 C. C. A. 97, 108, 150 Fed. 17, 28, 9 L. R. A. (N. S.) 557, 10 Ann. Cas. 357; Coghlan v. Stetson (C. C.) 19 Fed. 727, 729; Jacobs v. Spaulding, 71 Wis. 177, 186, 36 N. W. 608; Russell v. Allerton, 108 N. Y. 288, 292, 15 N. E. 391.

Counsel cite, in support of their contention that inclosures cultivated at the date of the lease only are protected by it from the boring of wells upon them, authorities to the effect that restrictions upon grants are strictly construed, and, in case of doubt, an interpretation which secures the freedom of the property is preferred (Peabody Heights Co. v. Willson, 82 Md. 186, 32 Atl. 386, 389, 36 L. R. A. 393), and to the effect that descriptions of rights and property conveyed relate to rights, muniments, and quantities existing at the respective dates of the conveyances (True v. Rocky Ford Canal, Reservoir & Land Co., 36 Colo. 43, 85 Pac. 842, 843; Hurley v. Brown, 98 Mass. 545, 96 Am. Dec. 142; Barber v. Allen, 212 Ill. 125, 72 N. E. 33, 36). But, when this lease was made, the title to the lands in the Osage Indian reservation was held by the Osage Nation in trust for its members, farming and grazing were the chief and the most lucrative occupations upon that reservation, and experience had, proved that farming had been, and probably would be, the most reliable and the most permanent pursuit. The income from farming, though moderate, was comparatively certain and continuous; the income from the mining of oil and gas was largely prospective, speculative, uncertain, and experimental. The purpose of the parties in making the lease, therefore, was, first, to protect and permit the assured occupation of farming, and second, to try the experiment of mining. This object is clearly disclosed in the resolution of the Council of the Osage Nation which is recited in the lease and in which the fact is stated that Foster has made application to the Council for the privilege of boring wells on the Osage reservation for petroleum and natural gas, and has proposed to enter into a contract for that purpose, upon terms that would not be detrimental to the agricultural interests of the country. There can be no doubt that the parties to the lease were of the opinion that the prospecting for and boring of wells upon

cultivated inclosures would be detrimental to the agricultural interests of the country, for they agreed, by the terms of their contract, that the lessee should neither prospect for nor bore such wells upon such inclosures. But they must have known that the privilege of prospecting for and boring wells on inclosures to be made and cultivated subsequent to the date of the lease and the unavoidable threat of the possible exercise of such a privilege would be far more detrimental to the agricultural interests of the country than the grant of such a privilege upon inclosures already cultivated, for the former would naturally deter inclosure and cultivation, while the latter would hardly cause the abandonment of inclosures already cultivated, unless it was actually exercised, and because the inclosures to be made and cultivated were certain to be much more numerous and far greater in area than those then under cultivation. At that time the cultivated area was so limited and the tracts that composed it were so small that there was little difficulty in drawing the oil and gas from beneath the surface of the reservation without placing wells upon the cultivated lands, and there was little probability that during the 10 years of the lease the area of these cultivated lands would so increase, or the tracts which composed it would become so large, as to substantially change this situation. The prohibitory clause which treats of cultivated inclosures relates to the future. It forbids prospecting for or boring wells subsequent to the date of the lease "on any cultivated inclosure." The term, "any cultivated inclosure," literally and fairly includes an inclosure made and cultivated after as well as one made and cultivated before the date of the lease, for the lessee could not bore wells on the former any more than on the latter without doing so on a cultivated inclosure. And so it is that the purpose of the lease to prevent detriment to the agricultural interests of the country, and at the same time to permit mining for oil and gas, the condition of the subject-matter of the contract, the situation of the parties and the circumstances surrounding them, the literal terms of the prohibition, and the natural meaning of those terms, converge to persuade that the more reasonable interpretation of it is that it forbids the lessee, and those claiming under him, from prospecting for or boring wells on an inclosure made and cultivated after, as well as upon one made and cultivated before, the date of the lease. And the conclusion is that this was the sense and meaning of the words they used upon which the minds of the parties met when they made this contract, that this was the intention they sought to express by it, and that it is the true construction of the lease.

Was the finding of the court that the portion of land of the defendants, upon which the complainant attempted to locate and bore its wells, was a cultivated inclosure sustained by the evidence? The tract of 120 acres was and had been inclosed for many months before the year 1911, when this controversy arose. Sixty acres of it had been cultivated, crops of corn and cotton had been raised upon it, and it was still in a cultivated state. Sixty acres in the northwestern part of it were wooded and uncultivated, and upon this portion of the inclosure the complainant located its wells in January or February, 1911, and during the same months the defendants cleared, grubbed, and

plowed a portion of it and completed the plowing of the entire tract by May of that year.

A cultivated inclosure is one in which the inclosure is cultivated. But neither this term nor its definition may be used to perpetrate a fraud or to deprive a lessee of this mining privilege of any of his just rights. The owner of the surface of the land cannot deprive him of his right to sink wells in and to produce oil from an uncultivated tract of sufficient area for that purpose by including it in the same inclosure with a cultivated tract. Nor does the inclosure of a cultivated tract and an uncultivated tract in the same inclosure deprive the cultivated tract of the protection of the prohibition of boring wells upon it which the lease contains. An inclosure which contains a cultivated tract and an uncultivated tract is a cultivated inclosure, and the lessee of the mining privilege is forbidden to prospect for, bore, or drill wells upon the cultivated tract, but he has the right under the lease to prospect for, drill, and operate wells upon the uncultivated tract on condition that his operations do not unnecessarily interfere with or disturb the owner of the land, or his tenant, in the occupation or use of the cultivated tract for agricultural purposes.

Again, the necessary effect of the interpretation of the lease which has been adopted in the earlier part of this opinion is that between the cultivator of the land and the owner of the mining privilege the lease gives the right of use and occupation of uncultivated land to him who first appropriates it to his use. And for the purpose of determining who is the first appropriator all the acts of each to that end relate back to his first open and notorious act for that purpose, provided always that act is done with the honest intent to make the appropriation and is followed with diligence until the land is subjected to his use.

And so the remaining question in this case is: Which of the parties to this suit first initiated proceedings in good faith to appropriate the uncultivated land in the northwestern part of the inclosure to his use? The court below answered that the defendants had commenced in good faith, and they thereafter diligently carried to completion, the process of cultivating the uncultivated tract in the northwestern part of the inclosure before the complainant first took steps to locate its wells thereon, and upon that ground it dismissed the bill. The evidence upon this subject is conflicting, the finding of the chancellor is presumptively correct, and the burden was on the complainant to show from the record that he was mistaken. The testimony on behalf of each of the parties has been read, digested, and compared, and it would be a useless task to recite or discuss it. It is sufficient to state the result, and it is that the examination and consideration of this evidence has failed to convince any member of this court that the chancellor below was in error in his finding of the facts or his conclusions of law.

The decree below must, therefore, be affirmed. And it is so ordered.