### JORGENSEN v. TUOLUMNE COUNTY, CAL.

(Circuit Court of Appeals, Ninth Circuit. May 5, 1913.)

#### No. 2,121.

**1. CONTRACTS (§ 147*)—RULES OF CONSTRUCTION.**

It is a cardinal rule for the interpretation of contracts that the court shall put itself in the place of the contracting parties as nearly as may be, and look from their viewpoint in entering into the contractual relations.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 730, 743; Dec. Dig. § 147.*]

**2. BRIDGES (§ 20*)—CONSTRUCTION—CONTRACT.**

A contract for building a bridge for a county across a river in accordance with plans and specifications made part thereof, which called for piers at each end and in the center, provided that the footings of piers, abutments, and wing walls should be embedded in the bedrock, that "it is assumed that the bedrock on each side of the river will be found at a depth shown on plans," and that, should it be found necessary to go to a greater depth to reach it, the work should be done by the contractors without additional expense to the county. The plans showed the depth to bedrock both on the sides and in the center of the river. *Held*, that the contract could not be construed to require the contractors at their own expense to sink the center pier 24 feet deeper than shown on the plans to reach bedrock, but must be held to assume, also, that bedrock in the center was approximately in the position shown, and to provide only for unimportant variations.

[Ed. Note.—For other cases, see Bridges, Cent. Dig. §§ 37–44, 46, 47; Dec. Dig. § 20;* Counties, Cent. Dig. § 197.]

**3. BRIDGES (§ 20*)—CONSTRUCTION—CONTRACT—LIABILITY FOR EXTRA WORK —CALIFORNIA STATUTE.**

The contractors by verbal direction of the county surveyor who represented the county on the work sunk the center pier the additional 24 feet necessary to reach bedrock. *Held*, that while the same constituted extra work, for which they would ordinarily be entitled to recover on a quantum meruit, the county was not liable therefor under Pol. Code Cal.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

§ 4073, which provides that no contract made by a county for a bridge or other structure shall be altered except by vote of two-thirds of the members of the board of supervisors, nor unless the change shall be specified in writing and the cost agreed upon.

[Ed. Note.—For other cases, see Bridges, Cent. Dig. §§ 37–44, 46, 47; Dec. Dig. § 20;* Counties, Cent. Dig. § 197.]

In Error to the District Court of the United States for the Second Division of the Northern District of California; W. C. Van Fleet, Judge.

Action at law by J. C. Will Jorgensen against the County of Tuolumne, Cal. Judgment for defendant, and plaintiff brings error. Affirmed.

The plaintiff, J. C. Will Jorgensen, and his brother, H. H. Will Jorgensen, under the firm name of Jorgensen Bros., constructed a reinforced concrete bridge across the Stanislaus river, under a contract with Tuolumne county, Cal. The river is the boundary between the counties of Tuolumne and Calaveras, and thus the bridge extends from one county into the other. In its construction Jorgensen Bros. were required to sink for the center pier, in order to embed it in bedrock, to a depth of 24 feet beyond the stratum designated on the bridge plans as bedrock, and this action is for the extra labor performed and materials furnished in excavating for said pier, and in the construction of the same for this depth and distance; the amount claimed therefor being $7,956.63. The complaint is in two counts. The first is for labor performed and materials furnished the defendant at its special instance and request; and the second is based upon a supposed warranty on the part of the defendant that bedrock would be found as indicated and represented upon its plans and drawings of the bridge to be constructed; the said Jorgensen Bros. having bid upon the work and entered into the contract in reliance upon such plans and drawings. The contract was let September 8, 1908, and the work of construction was to be completed by May 1, 1909. The additional excavation of 24 feet was done in time extending from October 25 to December 17, 1908. The mixing of the concrete and placing it in the pier up to the point where bedrock is represented on the plans to exist was completed by the 21st or 22d day of December, 1908. The bridge was completed and ready for delivery on or about the 1st of February, 1910, and was accepted by the county near the same time—H. H. Will Jorgensen says February 9th. On February 4, 1910, Jorgensen Bros. filed and presented to the board of supervisors of Tuolumne county their claim for extra labor and materials furnished in the construction of that part of the pier extending below bedrock as shown on the plans, and the claim was rejected on February 23d. The action was instituted March 29, 1910. The answer denies liability, and avers that the claim was not presented to the board of supervisors within one year after it accrued, with other matters. Before the commencement of the action, H. H. Will Jorgensen duly assigned his interest in the claim to J. C. Will Jorgensen. The trial being before a jury, a nonsuit was granted at the instance of the defendant, and the cause is here upon writ of error from the judgment accordingly rendered.

The record shows that the board of supervisors regularly advertised for bids for the construction of the bridge, and that in pursuance thereof Jorgensen Bros. bid for the contract, which was regularly let to them. The stipulated consideration for construction was $16,775, and $4 per cubic yard for stone retaining wall and 35 cents per cubic yard for any fill required. Seventy-five per cent. of one-half the contract price was made payable when one-half of the work was completed, but not earlier than December 7, 1908, the remainder to become due when the bridge was completed and accepted by the board of supervisors, but not earlier than the first Monday in May, 1909. It is further provided "that the plans and specifications filed with the county clerk shall constitute a part of this contract, and that said construc-

.tion, erection, and work shall be done and completed in a good and workman-like manner, according to said plans and specifications," and "that said party of the first part or their regularly appointed agent or superintendent shall at all times during the progress of said work, have free access thereto, and be allowed to examine the same, and all materials intended to be used in said structure, and if the same or any part thereof, shall not be in accordance with said plans and specifications, it shall reject and refuse to accept such defective work or materials, provided that such rejection of work and materials shall be made before their use."

The specifications provide, in so far as necessary to an elucidation of the issues presented by the present controversy, as follows:

"The exact location of this bridge shall conform with the surrounding conditions as shown by the accompanying map, plans, section and profile, which are all made a part hereof.

"The height shall conform to the official grade of the proposed fills as shown in the accompanying profile.

"The dimensions of this reinforced bridge shall be as shown on plans accompanying this specification. It shall be constructed to support with safety, at least a live load of twenty tons concentrated on any sixteen square feet of deck.

"The approaches at either end of the concrete bridge will consist of an earth and stone fill of lengths as shown on the profile plan and shall be bid on at a price per cubic yard. Contractors are requested to view the proposed work on the ground and judge of its nature and character before presenting bids.

"Foundations are to be constructed substantially as shown on plans. The footings of piers, abutments and wing walls will be thoroughly embedded in the bedrock. It is assumed that the bedrock on each side of the river will be found at a depth shown on plans. Should it be determined that it is necessary to go to a greater depth than this to reach bedrock, this work shall be done by the contractor without additional expense to either county. In any event, the contractor is to do all necessary excavation. * * *

"Any drawings or plans that may be listed in these specifications shall, together with the specifications, be regarded as forming a part of the contract. Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications must be done as though shown or mentioned in both.

"These specifications and the accompanying map, plans, and profile are intended to co-operate and explain each other and to provide a complete structure.

"All materials and workmanship shall be the best of their several kinds and all be under the supervision and to the satisfaction of the board of supervisors of each county and the engineer in charge of the work.

"During the absence of the contractor from the work, his foreman or a designated agent shall be held to represent him. Instructions given by the authorized engineer to the contractor's foreman shall be considered as having been given to the contractor himself. * * *

"Should the contractor fail to complete this bridge in the time specified in the contract hereinafter mentioned, the public may use any portion of the bridge, but such use shall not constitute an acceptance thereof."

The plans show two piers to be constructed at one end of the bridge, one in the center, and one at the other end. They also show a profile indicating bedrock at the foot of the piers at one end of the bridge and in the center, and in which they are to be securely embedded. As to the center pier they show also the distance from the spring line of the arch to bedrock to be 27 feet 6 inches.

J. C. Will Jorgensen testifies: "Before presenting my bid to the county of Tuolumne, on behalf of Jorgensen Bros., I visited the ground in accordance with the direction in the specifications and found that it compared pretty fairly with the nature of the ground, the conformation of the ground, the presence of bedrock, as compared with the sheet marked 'Plan of proposed Bridge,' and it gave me the impression that the profile I received was made according to the natural conditions." On cross-examination he stated that

according to his examination he imagined or concluded that the profile showed the bedrock all right, and that he made no examination to get down to bedrock—"could not very well do it."

H. H. Will Jorgensen testified that N. J. Pickle, county surveyor of Tuolumne county, was the agent and superintendent for the county, having charge and supervision over the construction of the bridge, and was present while the work of excavating was going on; that a week or two, after they reached the point where bedrock is designated on the plans witness had a conversation with him, and "he said we had to get to bedrock to get a solid foundation," and requested them to go down to bedrock.

F. J. Solinsky, Paul C. Morf, and Frank R. Wehe, all of San Francisco, Cal., for plaintiff in error.

J. C. Campbell and Walter Shelton, both of San Francisco, Cal., and Rowan Hardin, of Sonora, Cal., for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge (after stating the facts as above). Predicated upon this record, counsel for defendant urge that the contract entered into between Jorgensen Bros. and the county was single, entire, and indivisible, and that thereby the contractors engaged to go down to bedrock with the piers at whatsoever distance it might be found; while, on the other hand, counsel for plaintiff insist that the work of extending the center pier below the profile delineation marked "bedrock" was extra service rendered the county, for which the plaintiff should recover, on quantum meruit, for labor performed and materials furnished at the instance and request of the defendant, or upon the warranty of the defendant as to the position of the bedrock and a breach thereof in that bedrock was not found at the depth represented, and for fraud and deceit.

[1] As to which of these contentions is sound depends upon a proper construction of the contract. One of the cardinal rules for the interpretation of contracts is that the court shall put itself in the place of the contracting parties as nearly as may be, and look from their viewpoint in entering into the contractual relations. From such a viewpoint the court will observe the situation of the parties, the facts and circumstances which surrounded them and attended their considerations, and necessarily influenced them in concluding the contract, and in this way it will be the better enabled to discover and give effect to the true meaning, intention, and purpose of the parties, which is the real purpose of interpretation. Accumulator Co. v. Dubuque St. Ry. Co., 64 Fed. 70, 74, 12 C. C. A. 37; Salt Lake City v. Smith, 104 Fed. 457, 462, 43 C. C. A. 637.

[2] The plans and specifications for the construction of the bridge are expressly made a part of the contract, and it is further stipulated that anything mentioned in the specifications and not shown on the drawings, and vice versa, must be done as though shown or mentioned in both. So that clearly the plans and specifications, and every part of them, must be read into and constitute a part of the contract. The plans show by profile and delineation the position and location of bedrock, and it is provided that "the footings of piers, abutments, and

wing walls will be thoroughly embedded in the bedrock." It is further provided that the location of the bridge shall conform with the surrounding conditions as shown by the accompanying map, plans, section, and profile, which are all made a part of the specifications. With these charts and plans, the contractors were requested to view the proposed work on the ground, which they did, and from observations there made they concluded, as they say, that bedrock existed about as delineated by the profile, but without drilling or making further independent investigation for themselves as to whether bedrock in reality existed as represented. The bedrock, or outcroppings of the same, was visible on each side of the river, but not, of course, where the center pier was to be located, as there was considerable depth of water in the stream at the time.

Under the specifications "it is assumed that the bedrock on each side of the river will be found at a depth shown on plans." In the same relation it is further stipulated that, "should it be determined that it is necessary to go to a greater depth than this to reach bedrock, this work shall be done by the contractor without additional expense to either county." And immediately following this comes the stipulation: "In any event, the contractor is to do all necessary excavation."

From the context it would seem that the stipulation requiring the contractor to go to a greater depth to reach bedrock if it were determined to be necessary relates to the piers, abutments, and wing walls on each side of the river, and not to the center pier. The stipulation that "in any event the contractor is to do all necessary excavation" may have a broader signification; but, whether it does or not, it does not vitally affect the interpretation of the contract. From the fact that evidence of the position of the bedrock was discernible on the sides of the river, it was assumed that bedrock would be found at the depth as shown on the plans—that is, approximately—and, if it should be necessary to go to a greater depth for thoroughly embedding the piers, abutments, and wing walls upon each side of the river, then that the contractors should do that at their expense, and do all necessary excavation for the purpose. No assumption is expressly indulged as to the presence of bedrock in the bed of the stream as indicated by the chart or map. The foundation of the center pier, like the rest, however, was to be embedded in bedrock. Now, either it was assumed that the bedrock existed as it relates to this pier as shown on the map, or the specifications constituted a trap calculated to deceive the unwary contractor and induce him to believe that the county was aware of the approximate presence of the bedrock under the bed of the river as indicated, as they were aware of the approximate location of the strata upon the sides. Otherwise, why denote upon the map the presence of bedrock at the specific depth indicated? As a fact, the county made no drillings in the bed of the stream, or other effort to ascertain or determine the real or exact depth to bedrock, and therefore if dealing in good faith, which we must accord to its action, it through its engineer and draughtsmen did in reality assume that bedrock existed under the bed of the stream 27 feet 6 inches below the spring line of the arch of the bridge, as denoted on the map; that is to say, that it existed ap-

proximately at the depth so denoted, not to be exact, but in that neighborhood, and the negotiations were consummated upon that basis. Such was undoubtedly the design and purpose of the county, if we attribute to it, as we should, just and fair motives in dealing with proposed bidders and contractors, believing that bedrock would be found approximately as represented. So that the obligation of the contractors to go to bedrock as it pertains to the center pier is not different from their obligation with reference to the footings of the piers, abutments, and wing walls upon each side of the river. In legal effect, therefore, the representation on the map as to the presence and location of bedrock at the center pier was intended and designed to denote approximately its true location; and, considering such representation to be an approximation, the contractors consented and obligated themselves to go to a greater depth if found to be necessary to obtain secure footing in bedrock. As illustrative of this interpretation, see Salt Lake City v. Smith, supra, and Cook County v. Harms, 108 Ill. 151, 158.

We cannot agree with counsel that, because it is expressly stipulated that it is assumed that the bedrock on each side of the river will be found at a depth as shown on the plans, the contract should be construed as though nothing was assumed as to the position of bedrock in the bed of the stream, and that, therefore, the contractors took their chance as to its real position, and bound themselves to go to any depth to find it. The maxim "Expressio unius est exclusio alterius" can have no application in such a case. Thorn v. Mayor, L. R. 1 App. Cas. 120.

The case of Stuart v. Cambridge, 125 Mass. 102, and other cases cited of that character, cannot apply here. In that case there was a positive stipulation that the contractor was to commence with the basement walls 14 inches below the basement floor "and as much deeper as necessary to guarantee a firm and solid foundation," and it was held that by the stipulation the contractor bound himself to do all the work necessary to secure a solid foundation, although it extended below a distance of 14 inches below the basement floor.

In the case at bar, as we construe the contract, viewed in the light of the attending circumstances and conditions existing at the time of its execution, there is no such positive or express undertaking requiring the contractors to go to bedrock, at all events, at their own expense, to secure a footing for the center pier. Nor do we think that the representations made by the map constituted a warranty on the part of the county as to the position and locality of bedrock. We think, as we have indicated, that the parties assumed that bedrock existed as delineated, and that it was tacitly understood that the delineation was approximately correct, and it was in that view that the minds of the parties met. Within the terms of the contract, therefore, Jorgensen Bros. were not required to sink and construct an additional 24 feet of the center pier to bedrock as it was found to exist.

[3] N. J. Pickle, the county surveyor of Tuolumne county, was the county's superintendent of the work, having supervision over the construction of the bridge, and, according to the testimony of H. H. Will

Jorgensen, he requested and directed him (Jorgensen) to continue all excavations to bedrock, saying in effect that they had to get to bed-rock to get a solid foundation. Ordinarily this might well be construed to be a request to continue the work beyond the requirements of the contract, for which an action would lie as upon quantum meruit for the reasonable value of the extra services performed. It is suggested that a contract could not be so implied as it pertains to counties; they not being municipalities in the sense that towns and cities are regarded. But, however this may be, it is further urged that section 4073 of the California Political Code is restrictive of counties becoming so bound. The section reads:

"Whenever the board of supervisors shall enter into a contract for the erection, construction, alteration, or repair of any public building, bridge, or other structure, such contract shall not be altered or changed in any manner, unless they shall, by a vote of two thirds of their number, and with the consent of the contractor, first so order. And, whenever any such change or alteration is so ordered, the particular change or alteration shall be specified, in writing, and the cost thereof agreed upon between the board and the contractor. In no case shall the board pay or become liable to pay for any extra work done on, or extra material furnished for, such building or structure."

This statute, it seems to us, was designed to cover just such a case as is here presented. The work done in sinking and constructing the center pier to bedrock, a distance of 24 feet below the point as designated on the map, should be regarded as extra work, but for that work the board of supervisors would not become liable except in the manner prescribed in the section. The statute, we think, is preclusive of the county's liability in the present case.

This conclusion renders it unnecessary to consider the defense that the cause was not instituted in time.

A word as to the alleged warranty as insisted upon by plaintiff. The theory of a warranty presupposes that under the terms of the contract the contractors engaged to go to bedrock at whatsoever depth it might be found; but in our interpretation of the contract the parties entered into it upon the assumption that the map showed approximately the location of bedrock, and the contractors' obligation in constructing the piers is to be measured accordingly. What was done by the contractors beyond this obligation was extra, and beyond the requirements of the contract, and not in pursuance of it.

The judgment of the District Court should be affirmed.