## G. W. YOUNGS MINING CO. v. COURTNEY.

### In re HURON MINING CO.

(Circuit Court of Appeals, Sixth Circuit. January 5, 1915.)

No. 2664.

1. LANDLORD AND TENANT ☞198 — RE-ENTRY BY LANDLORD — UNACCRUED RENTS.

    A forfeiture and re-entry by the lessor under a lease between rental periods releases the lessee from liability for all rents not fully accrued.

    [Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. § 763; Dec. Dig. ☞198.]

2. MINES AND MINERALS ☞70—MINING LEASE—CONSTRUCTION—EFFECT OF FORFEITURE.

    A lease of iron ore lands for mining purposes for 30 years required the payment of a tonnage royalty, with a minimum payment each year, payable quarterly. It also provided that, if in any year the minimum payment required from and paid by the lessee was more than the agreed royalty on the tonnage produced in that year, the ore so paid for and not removed might be removed without payment in any subsequent year, provided it was in excess of the tonnage required to produce the minimum royalty in that year. In some years the royalty paid by the lessee on the ore produced exceeded the required minimum, but in others the minimum which it paid was in excess of the royalty on the ore produced, so that it became entitled to remove ore without payment in subsequent years in case its production was sufficient. Seven years after the lease, default was made in a quarterly payment, and two days later the lessor served notice of forfeiture, pursuant to which it took possession of the property a few days after the bankruptcy of the lessee. It also claimed a lien under the contract on bankrupt's personal property for the royalty due. *Held* that, while bankrupt had not produced sufficient ore in the current year to entitle it to a set-off for the excess of royalties paid, it had a contingent right thereto, which would have been valuable, but for the arbitrary forfeiture of the lease, and which the court might properly consider when the lessor was asking equitable relief, in effect in aid of its forfeiture.

    [Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 192–197; Dec. Dig. ☞70.]

3. MINES AND MINERALS ☞64—MINING LEASE—TRANSFER OF PROPERTY BY LESSEE—SALE OR LEASE.

    Claimant, a lessee of iron ore lands which it was mining under a lease for 30 years, transferred all of its property, including its plant, machin-

ery, ore on hand, and leasehold interest, to bankrupt, in consideration of a cash payment and a further payment of a large royalty for 15 years, with a specified minimum payment each year, payable quarterly. After about 7 years there was default in a quarterly payment, and it at once gave notice of forfeiture and took possession of the property. *Held* that the contract between the parties was not merely a lease, but was an executory contract of sale, and that under the law of Michigan, having declared a forfeiture and terminated the contract for default in payment of an installment of the purchase price, claimant could not also recover such installment.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 181–184; Dec. Dig. ☞64.]

Appeal from the District Court of the United States for the Western District of Michigan; Clarence W. Sessions, Judge.

In the matter of the Huron Mining Company, bankrupt; Joseph S. Courtney, trustee. The G. W. Youngs Mining Company appeals from an order of the District Court disallowing its claim for a lien. Affirmed.

The MacKinnon heirs owned lands supposed to contain iron ore. In August, 1905, they leased the premises to Youngs for exploration and working for the period of 30 years upon a royalty of 16 cents per ton with a minimum royalty of $2,000 per year, payable quarterly on January 20th, April 20th, July 20th and October 20th each year. The same year Youngs subleased the premises to the Youngs Company, which agreed to perform all the obligations of the lessee in the first lease, and, in addition, to pay Youngs a royalty of 9 cents per ton, with a minimum royalty of $1,000 per year, payable quarterly, as above. The next year, the Youngs Company sold its lease or subleased the same premises to the Huron Company, which agreed to make payments in amounts required by the first two leases, and also to pay the Youngs Company a royalty of 30 cents per ton, with a minimum royalty of $30,000 per year, payable quarterly, as above. During the three years, 1907–1909, the Huron Company mined and shipped more than 300,000 tons of ore, and paid to the three parties more than $99,000 which would have been the minimum royalty for the period. Each lease contained an agreement that if in any year the minimum payment, required from and made by the lessee, was more than the agreed royalty for the actual tonnage of that year, and "if in any one or more years more iron ore is thus paid for than is actually mined and removed in said year or years, then and in that event the iron ore so paid for and not removed may be removed in any subsequent year during the continuance of this lease without payment therefor, but such iron ore so permitted to be removed in any subsequent year in consideration of such prepayment must be in excess of the tonnage required" to amount to the agreed annual minimum. Obviously, if $30,000 was the separable and minimum annual royalty payable from the Huron Company to the Youngs Company, and the rate was 30 cents per ton, this required a minimum of 100,000 tons per year. If, however, the minimum royalty should be treated as one gross sum, $33,000, and the total royalty as 55 cents per ton, this required a minimum annual tonnage of 60,000. During each of the three years, 1910–1912, the Huron Company shipped more than 60,000 and less than 100,000 tons, paid to the MacKinnon heirs and to Youngs tonnage royalty in excess of their respective minima, and paid to the Youngs Company $30,000 each year. The result was that at the end of this three-year period, and after crediting to the Youngs Company 30 cents per ton on all ore shipped, it had paid the Youngs Company $8,586 not represented by such credit; in other words, it had, to this extent, paid for more ore than had actually been mined and removed, and was entitled to remove such ore in a subsequent year without payment therefor (of the 30-cent royalty to the Youngs Company), after it had, in the subsequent year, paid the agreed minimum. At the end of the third quarter of 1913, the tonnage shipped for that year was 44,000 (all shipped during that

quarter), while the minimum royalties to the three parties for the three quarters were $24,750. The Huron Company had paid the minimum for the three parties for each of the first two quarters, amounting to $16,500, and there remained unpaid the minimum for the third quarter, $8,250, of which $7,500 was due for the benefit of the Youngs Company, $250 for Youngs, and $500 for the MacKinnon heirs. On October 22d the Youngs Company gave the Huron Company the 60-day notice of forfeiture for nonpayment which was provided for in the lease between them. On December 17th, just before the 60 days expired, the Huron Company filed its voluntary petition in bankruptcy, and adjudication was made in due course. December 26th the Youngs Company served notice that the default had become absolute, and that it had taken "absolute, final, and unqualified possession of said property." The trustee in bankruptcy, in February, gave notice that he abandoned any right to continue the lease on behalf of the estate.

Thereupon the Youngs Company, pursuant to a paragraph of the lease which gave it, for unpaid royalty, a lien on all machinery and personal property on the premises, claimed to hold such property to secure its claim against the bankrupt for its minimum royalty or rental of $30,000 per year for the third and fourth quarters of 1913, and at the same rate computed for 1914 until the trustee's February abandonment. The trustee denied any such right. Finally it was agreed to let the trustee keep possession and to submit the whole controversy to the bankruptcy court. The Youngs Company filed its petition, and prayed that the amount due it be adjudicated, and its lien therefor confirmed and foreclosed. The trustee asked a judgment that there was no claim or lien, and an order directing him to sell the property free from lien. The District Court decreed that the Youngs Company had no valid claim, and ordered sale as prayed by the trustee. The Youngs Company appeals, but assigns no error on that part of the order which directed a sale free from lien.

N. C. Spencer, of Escanaba, Mich., and A. F. Dixon, of Stambaugh, Mich., for appellant.

J. E. Tracy, of Marquette, Mich., and S. H. Holding, of Cleveland, Ohio, for appellee.

Before WARRINGTON and DENISON, Circuit Judges, and KILLITS, District Judge.

DENISON, Circuit Judge (after stating the facts as above). 1. The contract involved is not free from ambiguity as to whether it contemplated a minimum annually of 60,000 or 100,000 tons. The construction put upon it by the parties clearly shows that they treated it as calling for the 100,000 minimum. We do not find it necessary to determine the question, but assume that the construction of the parties is the one which should be adopted.

[1] 2. The minimum royalty or the rental payable to the Youngs Company for the third quarter was due and payable October 20th; that for the fourth quarter would not be payable until January 20th. The Youngs Company's forfeiture and rescission became effective December 22d. Nothing was then due, excepting the payments for the third quarter; and the 30-cent royalty ($13,200) to the Youngs Company upon the ore taken out or carried away during the third quarter was less than the minimum royalty ($15,000) which had actually been paid to it on its own account for the first two quarters, and against which the Huron Company had taken out no ore. So there was nothing that would, on December 22d, give the 30-cent royalty for the last quarter any aspect, save that of a rental then partly accrued, but not due or payable. Under such circumstances the forfeiture and re-entry be-

tween rental periods forfeits every payment not fully earned. Speaking for the Circuit Court of Appeals of the Eighth Circuit, and citing authorities, Judge Sanborn said, in American Co. v. Pueblo Co., 150 Fed. 17, 30, 80 C. C. A. 97, 110 (9 L. R. A. [N. S.] 557, 10 Ann. Cas. 357):

"The termination of a lease during its term by surrender, by re-entry, or by eviction, without more, discharges the lessee from liability for rents that have not accrued, but leaves him liable for all the rents which have accrued and become due. * * * But a surrender, re-entry, or eviction between rent days, or at any time before the rent has fully accrued, releases the lessee from liability therefor, and defeats an action for its recovery."

And see Nicholson v. Munigle, 6 Allen (Mass.) 215.

The same principle applies here, if we consider this contract as a lease. There is nothing to indicate that the forfeiture, completed in December, was held open for the benefit of the trustee, or that his abandonment in February was operative to forfeit any existing right. It follows that neither the minimum for the last quarter of 1913 nor the fractional amount accruing in 1914 can survive the forfeiture; and the Youngs Company claim, prima facie provable, if the contract is one of lease, was $7,500, the third quarter's minimum.

[2] 3. The above-stated balance of $8,586, coming over from 1912, cannot operate to offset the $7,500 minimum rental for the third quarter of 1913. The error in assuming that it works such payment or offset comes from overlooking its contingent character. It did not represent ore which the Huron Company had paid for and was absolutely entitled to take in 1913, but only that which it was entitled to take in 1913, *if and after* it had taken, or at least paid for, the minimum for 1913; and this point never was actually reached, nor do we see that it was precipitated by the forfeiture in October and December, and so to be thought of as reached constructively.

4. Notwithstanding the conclusion of the next preceding paragraph, it is not to be doubted that the Huron Company had an equity, represented by this $8,586 advance payment. It stood for ore in the ground, which, judging from the average of the elapsed years of the term, the Huron Company would, sooner or later, become entitled to remove without payment; and this right was arbitrarily cut off and its maturity made impossible by the Youngs Company's election to forfeit the lease. The Youngs Company now seeks the aid of a court of equity to enforce a lien which, except for this forfeiture, might not have required enforcement; in other words, by its own action in forfeiting the lease, it has caused a loss or forfeiture of the Huron Company's contingent, but valuable, right to take free ore, and this contingent right, had it not been arbitrarily destroyed, might well have proved of value equal to the defaulted rental. Under familiar principles, the court will not be inclined to give its aid, even in this collateral way, to the enforcement of a penalty or forfeiture; but in the view we take of the case we do not need to decide whether this consideration alone would lead to the denial of the lien.

[3] 5. The contract here involved, and which we have so far for convenience called a lease, was of a peculiar and a mixed character. Its substantial result was to sell and assign the rights of the Youngs

Company as lessee under and pursuant to the two underlying leases. It conveyed all the existing assets of the so-called lessor, including ore, stock piles, mining machinery, accounts receivable, etc. It recited that it was for a consideration of $50,000 cash payment, in addition to the agreed future royalties, and in addition to the assumption and payment of $75,000 existing debts of the lessor. The total agreed royalty of 55 cents per ton is conceded to be a much higher royalty than had ever been paid in the district. Whenever 1,500,000 tons should have been mined, and the royalty thereon (which would be $450,000) should have been paid, the lessee's—or grantee's—obligations were ended, and it would hold the property for the remainder of the term free from royalties. As these payments were required to be at the rate of at least $30,000 per year, the rent—or royalties, or purchase price—would be paid in full in 15 years, and the remaining 14 years would be rent free. Assuming that the operations would be evenly distributed over the whole term, this would mean that each royalty payment of 30 cents per ton would operate, one-half as payment for what had been mined, and one-half in advance. Taking the whole transaction together, it was in effect a sale and assignment of the Youngs Company's leasehold rights and its entire business and assets for a total consideration of $575,000, $125,000 to be paid at once and $450,000 in equal annual installments for 15 years—or, perhaps, more rapidly—and the postponed payments, for security and for convenience, took the shape of royalties or rentals. While, for many purposes, the contract was one of lease, yet we cannot doubt that, in its general aspect, it was, at least equally, if not predominantly, an executory contract of sale.

It is settled law in Michigan that the vendor in an executory sale contract, exercising his contractual right of forfeiture for the vendee's nonperformance, cannot at the same time thus rescind the contract and also enforce its matured provisions. Specifically, it is held that such a vendor, either of real estate or personalty, who has forfeited the contract and taken back possession because the vendee failed to make a payment when it was due, cannot maintain an action to recover that payment. The cases as to personalty are reviewed and applied in Perkins v. Grobben, 116 Mich. 172, 74 N. W. 469, 39 L. R. A. 815, 72 Am. St. Rep. 512; and as to real estate Judge Christiancy said, in Goodspeed v. Dean, 12 Mich. 352:

"The plaintiff elected to treat the contract as void, and gave defendant a notice to quit. By this election we think he must be understood as having also relinquished his right to the amount then due upon the contract. He could not treat it as void in respect to the rights which it secured to the defendant and valid in respect to those which it secured to himself. Having declared it void as to the land, it was void also as to the payments which it had bound the defendant to make for the land. There was nothing, therefore, upon which plaintiff could base a right of action for either the principal or the interest which had become due upon it."

When we consider both this principle, with its necessary application to this case, and also the fact that to enforce and foreclose the lien would be, in some measure, aiding to enforce a forfeiture, as pointed out in paragraph 4 above, we are satisfied that the court rightfully dismissed the petition.

6. Whether the contract be regarded as a sale or a lease, the compensation promised to these underlying lessors, at the total rate of 25 cents per ton (and which, for the third quarter, amounted to about $9,500 above the minimum which the Huron Company had paid to them during the year), partakes of the character of a purchase price of items severed from the realty and carried away; and whether the right to recover such $9,500 was lost to these lessors by the forfeiture of the lease would present a question not within any issue here decided. There was no direct contract relationship between them and the Huron Company. The petition herein, filed by the Youngs Company, does not allege that there had been any novation, or that it was complaining for and in the interest of and in the right of these lessors. On the contrary, it alleges that it had paid to them their total royalty earned for the third quarter, whereby it was entitled in its own right to recover from the Huron Company this amount as well as its own royalty. It follows that whatever claim it has thus merged with its own and thus asserts on its own account must be treated as an integral part of its own claim. The unit of accounting is not the quarter, but the year; and we find that, during the year 1913, the total royalties earned at 55 cents per ton were $24,250, and that upon this the Huron Company had paid $16,500. The total amount of earned royalty unpaid was therefore less than the total minimum for the third quarter; and the controversy in the only aspect in which it can now be considered—as one between the Youngs Company and the Huron Company—thus appears to relate substantially to nothing except a minimum and unearned royalty, a pure rental, and is fully covered by what has been said.

7. At the hearing, the purchaser of the property at the sale which the trustee, before any appeal was taken, had made pursuant to the order, applied for a further bond which would protect him against damages arising because he had been enjoined from removing the property pending appeal. The motion suggested that the present bond running to the trustee would not protect the purchaser. Our disposition of the appeal makes it unnecessary to decide this motion. If it could have been presented long enough in advance of the hearing on the merits to permit an effective order for a further bond, it would have required decision.

The order appealed from is affirmed, with costs.